STATE of Utah, Plaintiff and
Respondent,

v.

Randy TAYLOR, Defendant
and Appellant.

No. 17674.

Supreme Court of Utah.

April 5, 1983.

David L. Wilkinson, Atty. Gen., Roger Cutler, Salt Lake County Atty., Paul Maughan, Stanley H. Olsen, Asst. Salt Lake Co. Attys., Salt Lake City, for defendant and appellant.

John H. Weston, G. Randall Garrou, Brown, Weston & Sarno, Beverly Hills, Cal., Jerome H. Mooney, Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

### I

The appellant, Randy Taylor, seeks review of a judgment of the Third District Court affirming a conviction entered against him in the Fifth Judicial Circuit Court, for a violation of Utah's pornography statute, U.C.A., 1953, § 76–10–1204. His appeal raises a number of constitutional questions, but does not challenge the validity or constitutionality of any statute. Before we may reach any of those constitutional questions, it is necessary to determine whether this Court has jurisdiction pursuant to U.C.A., 1953, § 78–3–5 (Supp.1981) or whether Article VIII, Section 9 of the Utah Constitution prohibits this appeal.

Section 78–3–5 provides:

> Appeals shall lie from the final judgments of justices of the peace in civil and criminal cases to the district courts, on both questions of law and fact, with such limitations and restrictions as are or may be provided by law; and the decisions of the district courts on these appeals shall be final, except in cases involving a constitutional issue. Appeals shall also lie to the district courts from the final judgments of the circuit courts, and from the final judgments of the juvenile courts, except where a direct appeal to the Supreme Court is expressly provided for. *The decisions of the district court on appeals from circuit courts shall be final except in cases involving a constitutional issue.*

U.C.A., 1953, § 78–3–5 (Supp.1981) (emphasis added). Article VIII, Section 9 of the Constitution of Utah, entitled "Appeals from district court—From justices' courts," reads as follows:

> From all final judgments of the district courts, there shall be a right of appeal to the Supreme Court. The appeal shall be upon the record made in the court below and under such regulations as may be provided by law. In equity cases the appeal may be on questions of both law and fact; in cases at law the appeal shall be on questions of law alone. Appeals shall also lie from the final orders and decrees of the Court in the administration of decedent estates, and in cases of guardianship, as shall be provided by law. *Appeals shall also lie from the final judgment of justices of the peace in civil and*

*criminal cases to the District Courts on both questions of law and fact, with such limitations and restrictions as shall be provided by law; and the decision of the District Courts on such appeals shall be final, except in cases involving the validity or constitutionality of a statute.*

Utah Const. art. VIII, § 9 (emphasis added).

▉ The issue before us is whether the emphasized language from Article VIII, Section 9 renders unconstitutional the emphasized language from § 78–3–5. There is no question that the first sentence of § 78–3–5, purporting to expand the right to appeal district court decisions in cases originating in justice of the peace courts to include every "constitutional issue," is unconstitutional. Article VIII, Section 9 expressly provides that the constitutionality or validity of a statute must be challenged, and this Court has consistently and uniformly applied that restriction to justice of the peace cases. *See, e.g., State v. Munger,* Utah, 642 P.2d 721 (1982). However, the portion of the statute dealing with appeals in circuit court cases is severable, and may be upheld if it does not on its own merits contravene the constitutional restriction.

▉ Only two ways exist in which § 78–3–5, as it affects appeals from circuit courts, may be held unconstitutional: (1) where the sole source of appellate jurisdiction is the Constitution of Utah, and the Legislature has no power to create additional jurisdiction; or (2) where the reference to "final judgment of justices of the peace" in Section 9 of Article VIII includes final judgments from the circuit court. The first result, requiring a holding that the Legislature has no power to create appellate review for the decisions of courts not specifically referred to in the Constitution, is clearly untenable. It flies in the face of the long history of decisions of this Court in which appeals from the city courts (in civil cases where the judgment or amount in controversy, depending on the statutory language, exceeded $100), from the juvenile courts, and from certain administrative tribunals have been permitted, even though

the Constitution does not mention any of those courts. Clearly, the Legislature has the power to confer appellate jurisdiction in connection with the decisions of any inferior court where such jurisdiction is not expressly prohibited by the Constitution. Appellate jurisdiction, as this Court has previously held, may exist by virtue of a constitutional grant *or* by statute. *See, e.g., Town of Ophir v. Jorgensen,* 63 Utah 288, 225 P. 342 (1924); *Castle Dale City v. Woolley,* 61 Utah 291, 212 P. 1111 (1923). In *McCashland v. Keogh,* 32 Utah 11, 88 P. 680 (1906), a case which had originated in city court, this Court stated:

> We think it is quite clear that the constitutional right to an appeal is given only in the following cases: (1) In criminal cases (article 1, sec. 12); (2) from final judgments of the district courts where the cases originate in that court as above outlined, including probate matters; and (3) from justices' courts to district courts. In all other cases, while the appellate jurisdiction—that is, the power generally to hear and determine appeals—exists, the right to an appeal, nevertheless, depends upon legislative action alone, the right itself not having been conferred by the Constitution.

*Id.* at 19, 88 P. at 682. Although acknowledging that the constitutional grant also constituted a limitation in that case, the *McCashland* Court articulated the rationale for narrowly construing such limitations:

> As the district courts have concurrent jurisdiction in all cases with inferior courts, and all inferior courts are deprived of jurisdiction in all matters where important rights may be affected and in all other cases have jurisdiction only in specified and limited amounts, it is easy to perceive why the framers of the Constitution relegated the right to appeal to the Legislature, except in certain specified cases above referred to. To hold that the right of the Legislature to regulate appeals from inferior courts is prohibited by the Constitution, except as specified in that instrument, is to impose a limitation on that body by implication.

Such limitations are not, and should not be, favored, and ought not be imposed by the courts, except where the implication is both necessary and unavoidable, when considered in the light of the language used in that instrument, and applied to the subject-matter under consideration. *Id.*

■ Thus, the Legislature clearly has the power to create appellate jurisdiction beyond that granted in the Constitution, so long as the statutory grant does not run afoul of any specific constitutional limitation. The crucial issue, then, is whether the constitutional language prohibiting appeals to this Court in justice of the peace cases likewise prohibits such appeals in circuit court cases. This can be so only if the circuit courts established by the Legislature in 1977 can be considered so analogous to the justices of the peace referred to in the Constitution as to require identical treatment.

The circuit court system supplanted an earlier statutory scheme which included city courts and justice of the peace courts. Justice of the peace courts were not eliminated, however, when the circuit courts came into being; only the city courts disappeared. The city courts were established in 1901, with the following language concerning appeals:

> From all final judgments of a city court a motion for a new trial may be made, and an appeal may be taken by either party in a civil case, or by the defendant in a criminal case, to the district court of the county *in the manner and with like effect as is now, or may be provided by law from appeals from justices' courts in similar cases,* and from all final judgments in the district courts rendered upon such appeals, an appeal may be taken to the supreme court in like manner as if said actions were originally commenced in the district court; *provided, however,* when the judgment in the district court does not exceed one hundred dollars, exclusive of costs, that the same shall be final, and no appeal shall lie therefrom; *and provided further,* that in

cases involving the validity or constitutionality of the statute, there shall be a right of appeal to the supreme court. 1901 Utah Laws, Ch. 109, Sec. 18 (emphasis added and in the original). This statute was later amended to refer to the "amount in controversy" instead of the "judgment in the district court." In *Salt Lake City v. Lee,* 49 Utah 197, 161 P. 926 (1916), the amended statute was construed as follows:

> While somewhat ambiguously expressed, yet we think the statute fairly means that in all cases, both criminal and civil, an appeal lies from the city court to the district court; and from all final judgments in the district court rendered upon such appeals an appeal lies to the Supreme Court, provided, however, the amount in controversy exceeds $100 or the case involves the validity or constitutionality of a statute or an ordinance. The proviso that when the amount in controversy does not exceed $100 the judgment shall be final and nonappealable is a restriction and a limitation upon the language preceding it, and imposes a condition precedent to the right of an appeal to the Supreme Court.

*Id.* at 198–99, 161 P. at 926. This Court went on to hold that a criminal penalty could not be regarded as an "amount in controversy," and that a district court decision upholding a criminal conviction from the city court was not appealable to the Supreme Court. The reason for that analysis, of course, is that there existed no constitutional *or* statutory authority for criminal appeals in city court cases, and not that such would be prohibited by the Constitution. This is obvious because this Court clearly considered civil appeals to be permissible where the statutory $100 minimum was exceeded.

Some confusion has occurred in more recent decisions, however, by reason of the absence in those decisions of any consideration of the distinction between civil and criminal cases originating in city court. It is quite clear, for example, in *State v. Lyte,* 75 Utah 283, 284 P. 1006 (1930), that this Court rejected the appeal because of the

existence of a *statute* which did not permit appellate review, the same statute construed in *Salt Lake City v. Lee, supra.* This Court rejected the appeal after finding that the statute was consistent with Article VIII, Section 9 and Article I, Section 12 of the Utah Constitution, and not because of a view that the Constitution flatly prohibited such appeals if the Legislature should choose to authorize them.

In *Salt Lake City v. Granieri,* 16 Utah 2d 245, 398 P.2d 888 (1965), a case involving a criminal appeal from city court, this Court declared that:

> In similar cases, this court has several times reaffirmed that under the above constitutional provision [Art. VIII, Sec. 9] *and its implementing statute* on appeal from a city to a district court the action of the district court is final and no appeal lies therefrom to this court.

*Id.* (emphasis added) (citing *State v. Lyte,* 75 Utah 283, 284 P. 1006 (1930), and *Salt Lake City v. Perkins,* 122 Utah 43, 245 P.2d 1176 (1952)). As discussed above, and as noted in the preceding comment from the *Granieri* decision, those decisions were based on the absence of *either* a statutory *or* a constitutional grant of appellate review, and not on the theory that Section 9 of Article VIII contained a prohibition. The same proposition was repeated in *Salt Lake City v. Peters,* 22 Utah 2d 127, 449 P.2d 652 (1969), with this· Court citing the *Granieri* decision as authority.

A review of every case decided prior to 1976 demonstrates that each was decided in the context of a *statutory* scheme, and not on the basis of a constitutional prohibition on appeals in criminal cases originating in city court. Thus, in *State v. Roberts,* 56 Utah 136, 190 P. 351 (1920), this Court said, in discussing *Salt Lake City v. Lee, supra,* as controlling:

> The appeal in that case was based upon the identical statute upon which the appeal is based in the case at bar, and on which the appeal in the *Falsetta Case* [sic] was based. The section referred to is set forth at length in the case of *Salt Lake City v. Lee,* supra, and need not be

repeated here. After that decision was handed down the Legislature re-enacted the section in the precise language as it was when it was construed in the *Lee Case* [sic]. The act relating to city courts of this state was amended by Chapter 34, supra, and one of the principal changes made in said amendment was to make the section to which we have referred, giving the right of appeal from city courts of cities of the first class, and which was construed in the *Lee Case,* [sic] applicable to all the city courts of this state, whether of the first or second class, whereas, before that time, that section had applied only to the courts of cities of the first class, which included Salt Lake City. *By re-enacting said section we must assume that the Legislature was satisfied with the construction this court placed upon the statute in the Lee Case therefore adopted the same and made it applicable to all the city courts of this state. It is needless therefore to enlarge upon the reasons why this appeal cannot be sustained.*

*Id.* at 137–38, 190 P. at 352 (emphasis added) (citations omitted). Again in *State v. Brown,* 75 Utah 37, 282 P. 785 (1928), this Court cited *Salt Lake City v. Lee, supra,* and said:

> That case is identical with the case at bar, .except that that case was for the violation of a city ordinance, while here it is for the violation of a statute, but the question involved is the same. *The evident intention of the Legislature was that the jurisdiction of city courts in criminal cases arising under the statute should be exactly the same as that of justices of the peace, and that the rights of appeal therefrom should be the same.*
>
> . . . .
>
> . . . The jurisdiction of this court on appeal from cases arising in a *justice's court* is limited by the State Constitution, which provides that no appeal shall lie from judgments of the district court, "except in cases involving the validity or constitutionality of a statute." State Constitution, art. 8, § 9. *In criminal*

*cases arising in a city court the rule is the same, except that an appeal is allowed to this court where the validity or constitutionality of a statute or ordinance is involved, Section 1717, supra. In civil cases arising in a city court the jurisdiction of this court on appeal is further extended to cases where the "amount in controversy" exceeds the sum of $100. Such in our opinion is what was intended by the Legislature in the section to which we have referred.*

Id. at 39–41, 282 P. at 786 (emphasis added). It is significant to note that this Court refers to the Constitution only in connection with justice of the peace courts, and cites only the statute in connection with city courts, pointing out that the *statute* precludes all criminal appeals but permits some civil appeals.

Thus, as demonstrated above, all of the pre-1976 cases acknowledged the Legislature's power to limit or expand appellate jurisdiction over city court cases in both civil *and criminal* appeals. In *State v. Sheldon,* Utah, 545 P.2d 513 (1976), however, this Court without analysis completely eliminated all reference to the Legislature's prerogatives to affect city court appeals by statute. This Court held, *for the first time,* that Article VIII, Section 9 of the Utah Constitution, standing alone, prohibited *any* appeals from city court to district court not involving the constitutionality or validity of a statute:

> Since Murray City Court is ex officio a justice court having jurisdiction throughout the county, appeals to the district court are, by Article VIII, Section 9 of the Utah Constitution, made final except as to cases involving the validity or constitutionality of a statute.

*Id.* at 513–14. No authority is cited for this entirely novel proposition, except *Eureka City v. Wilson,* 15 Utah 53, 48 P. 41 (1897), aff'd, 173 U.S. 32, 19 S.Ct. 317, 43 L.Ed. 603

(1899), which involved a case originating in justice of the peace court. It appears that the *Sheldon* Court simply equated city courts with justice courts for the purpose of constitutional review by virtue of the former's status as "ex officio" justice courts. However, that ex officio status had been a feature of the city courts since their creation in 1901, and yet had never been the grounds for treating appeals from city courts in the same fashion as appeals from justice courts.[1] The sole reason for that treatment, as discussed above, was a statutory scheme which specifically required city appeals to be handled in the same fashion as justice court appeals, with certain exceptions for civil cases worth more than $100. The *Sheldon* Court overlooked the Legislature's power to affect jurisdiction over appeals from city court by statute, and simply equated city courts with justice courts, relying on the "ex officio" theory.

We cannot now continue the *Sheldon* Court's error by oversight and extend it to appeals from cases originating in circuit courts. U.C.A., 1953, § 78–3–5 (Supp.1981) clearly sets forth the Legislature's intent that this Court hear appeals from district courts in all "cases involving a constitutional issue." Whereas it was, in an earlier era, the desire of the Legislature to treat appeals from justice courts and from city courts alike for the most part, there is no indication anywhere in the present statutory system that such is intended to be the case for appeals from circuit courts. Likewise, no reading of Article VIII, Section 9, standing alone, or in light of the historical construction placed upon it, suggests that it should or must be read to mean "circuit court" when it says "justices of the peace." The standard articulated in *McCashland, supra,* bears repeating:

> To hold that the right of the Legislature to regulate appeals from inferior courts is prohibited by the Constitution,

---

1. 1901 Utah Laws, Chapter 109, Sec. 14 provides:

> The city court shall have exclusive original jurisdiction of cases arising under, or by reason of the violation of any city ordinances, and shall have the same powers and jurisdiction as justices of the peace in all other criminal actions, and the judges of said courts shall be magistrates, with all powers and jurisdiction of justices of the peace as magistrates.

except as specified in that instrument, is to impose a limitation on that body by implication. Such limitations are not, and should not be, favored, and ought not be imposed by the courts, except where the implication is both necessary and unavoidable. . . .

*Id.* 32 Utah at 19, 88 P. at 682. It is neither necessary nor unavoidable to find U.C.A., 1953, § 78–3–5 (Supp.1981) unconstitutional. In fact, in light of our increasing caseload, it may be desirable to limit this Court's jurisdiction. However, where the Constitution permits legislative action, we should not limit the Legislature's prerogatives, even to effect a desirable objective. We therefore hold that, pursuant to U.C.A., 1953, § 78–3–5 (Supp.1981), this Court has jurisdiction over this case, which involves "constitutional issue[s]."

## II

On its merits, this appeal poses three questions. First, does the inadequacy of the transcript of the voir dire phase of the trial require a new trial? Second, was the appellant denied due process of law by inadequate voir dire of potential jurors? Finally, did the trial court err in refusing to instruct the jury that they must acquit if they could not agree on a definition of current community standards respecting pornography? We will treat these questions in order.

The appellant argues on this appeal that the voir dire examination of potential jurors by the court in this case was inadequate both for a determination of actual bias as a basis for dismissals for cause and for the intelligent exercise of peremptory challenges. He further suggests to this Court that numerous deficiencies in the trial transcript make it impossible for this Court to adequately review these threshold claims. We agree. In 43 pages of transcript, there are more than 35 notations of "inaudible" responses from potential jurors and one gap in the proceedings. It is true that the majority of those omissions relate to peripheral information which does not affect the issues on appeal. However, approximately 10 of the inaudible responses either came

from jurors about whose impartiality there is considerable question based on other responses in the record, or they relate directly to the issue of whether the trial judge erred in not eliciting sufficient information from jurors to permit intelligent and informed jury selection. With respect to the former, the following exchanges occurred between the court and a juror who was unsuccessfully challenged for cause and subsequently served as foreperson of the jury:

[THE COURT]: This matter will involve some rather explicit scenes. The jurors are going to have to probably view the movie, if we reach that point, and I would like you to understand that there are always reasons and occasions when the trials are interrupted for legal reasons. But there will be explicit scenes of sexual contact and conduct. The movie will present such things as fellatio, cunnilingus, masturbation, sexual intercourse. Now, would any of you, because of your upbringing or training, be very uncomfortable if you're required to see that? Would the seeing of it, alone, cause you emotional distress or disturbance?

Mrs. Linford, you raised your hand. Do you feel that it would be impossible for you to sit as a juror in a case of this sort?

MRS. LINFORD: (inaudible)—I'm not married. I've never attended a movie of this type—

THE COURT: I appreciate that most of you probably have not. But it's a difficult situation. I'm sure many of you have never been robbed or witnessed a crime of any sort. And still, people are required, a jury is required to sit on such matters.

Do you feel that the circumstance would be such that you could not, if selected, view the evidence and based upon that and the other evidence that might be presented in this case, render a fair and impartial verdict? That is the question: Do you think you could be completely fair and impartial, after hearing and viewing the evidence, listening to the law, render a verdict concerning the case?

MRS. LINFORD: (Due to a continuing background noise, it is impossible to hear her response.)

THE COURT: Well, that's what we're asking. I know that the thought might be discomforting to some of you. As I've mentioned, there's many cases that are discomforting to juries.

Now, the question is, could you do it and be completely fair and impartial as it involves the charge, the evidence and the laws the Court will state to you?

MRS. LINFORD: (Inaudible response).

THE COURT: Do you think you could be fair and impartial?

MRS. LINFORD: (Inaudible response).

THE COURT: All right.

\* \* \* \* \* \*

[THE COURT]: On the other hand, have any of you taken an active part in any program or organization that has opposite view; that there are certain restraints and that the presentation of explicit sex acts is, per se, obscene?

There are many different ways of presenting ideas. There's print, photograph, moving pictures and words. Have any of you ever had any part in an organization that was involved with what is called censorship? And whose prime interest or object was to restrict the distribution of material that might involve with sexually explicit circumstances; written, photographs—still photograph, or movie form?

Yes, ma'am?

JUROR: Would that mean the PTA organization?

THE COURT: Yes, ma'am, it would involve something like the PTA.

JUROR: And the church?

THE COURT: If you have an active part in that, yes, ma'am.

JUROR: Basically, what I have worked—

THE COURT: Well, the—what we're interested in is if you have, let us know. This, Counsel is entitled to. Again, the question is not how deeply you have been involved, even though you may have taken a very active part.

The question still is whether or not you can be fair and impartial, listen to all of the evidence, examine all of the exhibits and then render a verdict based upon the law that the Court will state to you. But the attorneys are entitled to know whether or not you have such involvement. And then the question is: Are you still capable of being fair and impartial. You've indicated that you have some involvement through PTA, is that correct?

JUROR: (No audible response).

THE COURT: And you are Mrs.—

JUROR: Werner.

THE COURT: Also, Mrs. Linford, you've indicated you've had some involvement and that has been in a religious organization, is that correct?

THE COURT: Let me ask you both again: Do you still feel that you can be fair and impartial, appreciating the fact that both agencies support the concept of fair trial in all instances.

Anyone else would like to identify your position or organization?

Do any of you feel that nudity alone is obscene?

Have any of you ever received unsolicited, sexually explicit materials through the mails?

I'm sure most of you are aware that there's a rating system for movies. Ranging all the way from a G rating, which is for General Public, to a PG, which is Parental Guidance, R, which is Restricted, and X which indicates a type of a film that ordinarily should be viewed only by adults.

Now, have any of you had anything to do with the classification of movies? And are you all aware of the rating?

Would any of you feel that an X rating alone is sufficient to indicate that a movie may be obscene?

MR. MOONEY: Could we see the hands on that again, Your Honor?

THE COURT: Were there any hands on that? You feel the X designation is sufficient to establish the fact that the movie is obscene?

Let me advise you again, just for your information, that obscenity is a legal standard. And you will be advised as far as the law is concerned.

JUROR: I would not even go to an R rated movie.

THE COURT: Okay, but just be—

JUROR: Because of what might be presented.

THE COURT: But the question still is, Miss Linford, could you be fair and impartial?

MISS LINFORD: I would try.

THE COURT: You would try. I would advise you right now that the rating alone, is not sufficient.

MISS LINFORD: I don't like that kind of suggestive movie.

THE COURT: But with that explanation, would you be willing to accept the law as the Court states it to you and again, could you be fair and impartial? You feel that you could be recognizing that these things are difficult?

MISS LINFORD: (No audible response).

THE COURT: As you're aware, both the State and Federal Constitution provide that there is freedom of speech, and that particular phrase has been expanded to include most methods of communication. However, the courts have always found that notwithstanding that Constitutionally protected right, it does not apply to obscene material.

\* \* \* \* \* \*

██ The district court, in denying the appellant's Motion for a New Trial based on Rule 6.5 of the Rules of Practice of the District and Circuit Courts,[2] observed that "the court must have been satisfied that her [juror Linford's] answers were sufficiently affirmative to leave her on the panel." When faced with claims that a juror's responses to voir dire questions demonstrat-

ed actual bias, this Court is not at liberty on appeal to assume what those answers showed when they are totally absent from the record and cannot be reconstructed by agreement of the parties.[3] Therefore, it was error for the district court to fail to order a new trial in the face of this inadequate record.

██ In view of our holding that a new trial is required because of our inability to review the appellant's claims about the voir dire on an inadequate record, we need not address those claims in any detail. However, we do emphasize that voir dire examination has as its proper purposes both the detection of actual bias, see U.C.A., 1953, § 77–35–18; *State v. Bailey,* Utah, 605 P.2d 765 (1980); *State v. Moore,* Utah, 562 P.2d 629 (1977), and the collection of data to permit informed exercise of the peremptory challenge. *See People v. Williams,* 29 Cal.3d 392, 628 P.2d 869, 174 Cal.Rptr. 317 (1981).

Although our holding above requires a new trial and disposes of this appeal, this Court is required to pass on and determine all questions of law involved in the case and necessary to its final determination. *See* Utah R.Civ.P. 76(a).

██ There is one remaining question to be determined: must the trial court in a pornography case instruct the jury that if they are unable to determine a community standard they must acquit the defendant? The appellant here claims error in the trial court's failure to give an instruction as follows:

In determining the community standard you may apply your experience in the community to determine if the community could reach a concensus on the issue; and if the prosecution has not proven a community standard beyond a reasonable doubt, you must find the defendant not guilty.

---

2. Rule 6.5 provides as follows:
 The failure of electronic recording equipment to record properly ... shall be grounds for the granting of a new trial except in those cases where the portion of the verbatim record not recorded is insignificant to the issues

in the matter before the court or would not affect the possible points of appeal.

3. The parties attempted to prepare an "Agreed Statement of Record" for the use of the district court, but were unable to fill in the significant gaps in the transcript by stipulation.

He argues that such an instruction is necessary because it requires the prosecution to meet its burden of proving the existence and content of a community standard and because it ensures that convictions will only result where there exists a community standard sufficiently "knowable" to give a defendant prior notice of what the law commands or forbids. The appellant analyzes the concept of an "average person" for purposes of deriving a community standard, and concludes that the average person "must be a member of a community where over 75% of the members would find a particular film, etc., to be both appealing to prurient interest and patently offensive." Otherwise, he argues, it would be impossible for a defendant to have clear advance notice that a particular film exceeds community standards of tolerance, and it would be a violation of due process to convict in the absence of such advance notice. The appellant relies on two Massachusetts cases in which similar arguments were apparently persuasive. *See Commonwealth v. Mascolo,* 7 Mass.App.Ct. 275, 386 N.E.2d 1311 (1979); *Commonwealth v. Trainor,* 374 Mass. 796, 374 N.E.2d 1216 (1977). We hold that the position advanced by the appellant and adopted by the courts of Massachusetts is not supported by the decisions of the U.S. Supreme Court or this Court, and that it is analytically unsound as applied to the operation of the jury deliberation process.

The basic test for determining whether material may be prosecuted as obscene under the First Amendment is set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973),[4] as follows:

The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find the work, taken as a whole, appeals to prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. at 2614 (citation omitted). The following quotation clarifies the *Miller* test:

The phrasing of the *Miller* test makes clear that contemporary community standards take on meaning only when they are considered with reference to the underlying questions of fact that must be resolved in an obscenity case. The test itself shows that appeal to the prurient interest is one such question of fact for the jury to resolve. The *Miller* opinion indicates that patent offensiveness is to be treated in the same way. The fact that the jury must measure patent offensiveness against contemporary community standards does not mean, however, that juror discretion in this area is to go unchecked. Both in *Hamlin* and in *Jenkins v. Georgia,* 418 U.S. 153 [94 S.Ct. 2750, 41 L.Ed.2d 642] (1974), the Court noted that part (b) of the *Miller* test contained a substantive component as well. The kinds of conduct that a jury would be permitted to label as "patently offensive" in a § 1461 prosecution are the "hard core" types of conduct suggested by the examples given in *Miller.*

*Smith v. United States,* 431 U.S. 291, 300–01, 97 S.Ct. 1756, 1763, 52 L.Ed.2d 324 (1977) (citations omitted).

*Miller* and subsequent cases also make clear the manner in which the community standards test is to be applied. The jury is to judge the material as the "average person" would judge the material. The primary concern with requiring a jury to apply the standard of "the average person, applying contemporary community standards" is to be certain that, insofar as material is not aimed at a deviant group, it will be judged by its impact on an average person, rather

4. Federal constitutional analysis is required because of the appellant's claims regarding violations of his First Amendment rights. Although the precedential value of *Salt Lake City v. Piepenburg,* Utah, 571 P.2d 1299 (1977), and *State v. Phillips,* Utah, 540 P.2d 936 (1975), is dubious in any event, we explicitly disavow the language and rationale of those opinions. *See* Firmage, "The Utah Supreme Court and the Rule of Law: *Phillips* and the Bill of Rights in Utah," 1975 Utah L.Rev. 593 & n. 1.

than a particularly susceptible or sensitive person—or indeed a totally insensitive one. *See Miller, supra; Mishkin v. New York,* 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The U.S. Supreme Court has stated:

> This court has emphasized on more than one occasion that a principal concern in requiring that a judgment be made on the basis of "contemporary community standards" is to assure that the material is judged neither on the basis of the juror's personal opinion, nor by its effect on a particularly sensitive or insensitive person or group.

*Hamling v. United States,* 418 U.S. 87, 107, 94 S.Ct. 2887, 2902, 41 L.Ed.2d 590 (1974). The Utah Supreme Court has approved jury instructions in pornography cases which incorporate these requirements that the jury look beyond their personal perspective to the community as a whole. *See, e.g., State v. Pierren,* Utah, 583 P.2d 69 (1978); *State v. International Amusements,* Utah, 565 P.2d 1112 (1977).

 Contrary to the appellant's analysis, the "average person" need not necessarily share the community consensus on what is obscene, but rather must be able to apply that community standard without his or her own sensitivities so coloring his perspective as to render the notion of community standard apart from the person's own perspective meaningless. A juror must be able to utilize the perspective of the "average person," and in the process put aside his or her own particular tolerance or lack thereof of the material in question.

 The erroneous assumption which is present by implication in the appellant's requested instruction, and is more explicit in the Massachusetts cases, is that the jury must first collectively determine what the community standard is and then apply that standard as the average person would to the allegedly obscene material. In fact, each juror makes its own factual determi-

nation on the question of whether specific material violates the community standard. The jurors may, and we assume they would, discuss among themselves the community standard and any particular juror might adopt any resulting consensus or rely upon his or her own understanding of the community standard. In any event, it is doubtful whether any jury or any particular juror would ever be very successful in articulating an abstract community standard on pornography without reference to the particular material before the jury. Nor is there any requirement that this be done. The U.S. Supreme Court has emphasized that it is a factual determination in each obscenity case as to whether the particular material violates the community standard as viewed by the average person. There is no requirement of an independent factual determination of what the community standard on pornography is in the abstract. Most jurors will not have seen a sufficient amount of material of the "hard core" type to have any point of reference to determine a community standard other than in reference to the material presented to them in the particular trial. Thus, the appellant in this case is asking the jury or individual jurors to do something which a juror is not capable of doing nor is required to do. Even if a juror could arrive at an abstract community standard, it would not be necessary for the jury itself to reach a consensus on what that standard is. It is only necessary that each individual juror be able to apply his or her view of the community standard as the average person would apply it. If a particular juror determines that he or she cannot arrive at the community standard, or that one does not exist, then that juror must vote to acquit.

 The State does have the burden of showing that the material has violated the community standard. If the State chooses, as is its option under U.C.A., 1953, § 76–10–1203(3),[5] not to put on expert tes-

---

**5.** Subsection (3) of this section provides:

Neither the prosecution nor the defense shall be required to introduce expert witness testi-

mony as to whether the material or performance is or is not harmful to adults or minors or is or is not pornographic, or as to any

timony, or any evidence, as to the community standard, it assumes the risk of a juror's not being able to arrive at such a community standard and voting to acquit a defendant. Other jurors may feel that they can determine a community standard and, based on that standard, vote to acquit or convict. If the jurors use different community standards and come up with different verdicts, then the result will be a deadlock, a hung jury, not an automatic acquittal. An analogous situation in criminal cases occurs if jurors are not able to agree on what the phrase "beyond a reasonable doubt" means. Disagreement among the members of the jury does not mandate an acquittal. Each juror decides independently whether the "reasonable doubt" test has been satisfied in the context of the evidence presented to the jury. The court's instructions do not require that a jury determine in the abstract what the phrase "beyond a reasonable doubt" means to the jury as a group. Conflicting votes among the members of the jury may reflect different ideas of what the "beyond a reasonable doubt" standard means. We accept this as part of the jury process.

The appellant's argument that, if the jury cannot arrive at a consensus on the community standard, such a standard is "not knowable," and therefore the appellant is denied due process in the absence of advance notice of it, can be rejected on three grounds. First, the law, as discussed above, does not require such a concensus among the jury members. Second, even if such a concensus among the jury members were required, the fact that a particular jury cannot agree does not make the community standard unknowable. The very idea that a "hung jury" does not require acquittal involves acceptance of the notion that while one jury may be deadlocked on one or more issues in a criminal case, a second jury, after a new trial, may reach a decision. In a different context involving a pornography case, the U.S. Supreme Court made an observation which is applicable to the appellant's contention.

element of the definition of pornographic, including contemporary community standards.

The mere fact that juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged. As this court observed in *Roth v. United States,* 354 U.S. at 492, n. 30 [77 S.Ct., at 1313 n. 30], "it is common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system."

*Hamling,* 418 U.S. at 101, 94 S.Ct. at 2899 (citation omitted). *See also State v. International Amusements,* Utah, 565 P.2d 1112, 1114 (1977). Third, the U.S. Supreme Court has made it clear that such an argument misconstrues the knowledge requirement in connection with offenses such as that charged here. As noted above, there is a requirement that obscenity statutes be limited to the depiction of sexual matters or activities of the "hard core" type. *See Miller,* 413 U.S. at 27, 93 S.Ct. at 2616; *Smith,* 431 U.S. at 301, 97 S.Ct. at 1763; *Jenkins v. Georgia,* 418 U.S. 153, 160–61, 94 S.Ct. 2750, 2754–2755, 41 L.Ed.2d 642 (1974). In *Hamling, supra,* the Court faced this question directly and rejected a claim similar to that now made by the appellant. The Court treated the issue as follows:

In *Rosen v. United States* [161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606], *supra,* this Court was faced with the question of whether, under a forerunner statute to the present 18 U.S.C. § 1461 ..., a charge of mailing obscene material must be supported by evidence that a defendant "knew or believed that such [material] could be properly or justly characterized as obscene ...." 161 U.S., at 41 [16 S.Ct., at 438]. The Court rejected this contention, stating:

"This statute is not to be so interpreted. The inquiry under the statute is whether the paper charged to have been obscene, lewd, and lascivious was in fact of that character, and if it was of that character and was deposited in the mail by one who

U.C.A., 1953, § 76–10–1203(3).

knew or had notice at the time of its contents, the offence is complete, although the defendant himself did not regard the paper as one that the statute forbade to be carried in the mails. Congress did not intend that the question as to the character of the paper should be dependent upon the opinion or belief of the person who, with knowledge or notice of its contents, assumed the responsibility of putting it in the mails of the United States. The evils that Congress sought to remedy would continue and increase in volume if the belief of the accused as to what was obscene, lewd, and lascivious was recognized as a test for determining whether the statute had been violated." *Id.* at 41–42 [16 S.Ct., at 438].

*Hamling*, 418 U.S. at 120–21, 94 S.Ct. at 2909 (citations omitted).

The Utah Code makes a person guilty of distributing pornographic material when he "knowingly" engages in certain conduct. *See* U.C.A., 1953, § 76–10–1204(1). The Code describes "knowingly" as "an awareness, whether actual or constructive of the character of the material or of a performance." U.C.A., 1953, § 76–10–1201(4). The due process requirement as set forth by the U.S. Supreme Court is that the appellant have knowledge of the character of the material as being of the "hard core" type and not that he have knowledge that, in applying the test of the average person using contemporary community standards, the material is legally obscene. The appellant appears to claim that it is this second level of knowledge which is required and in that regard his contentions are not well taken.

We therefore hold that, upon retrial of this case, the appellant is not entitled to an instruction requiring the jury to find that the prosecution has "proven a community standard beyond a reasonable doubt," and to determine "if the community could reach a concensus on the issue," or to return a verdict of not guilty.

The judgment is vacated and this case is remanded for a new trial.

STEWART and HOWE, JJ., concur.

OAKS, Justice (dissenting):

For the reasons stated herein, we should dismiss this appeal because we are without jurisdiction to entertain it. I therefore dissent from the granting of a new trial and from Part I of the majority's opinion, and express no opinion on the subjects treated in Part II.

A circuit court jury convicted defendant of distributing pornographic material, U.C.A., 1953, § 76–10–1204, and he appealed to the district court. After that court affirmed his conviction, he took this further appeal to this Court. At the request of the Court, the parties have briefed the question of this Court's jurisdiction in such cases. I conclude that the statute purporting to grant this Court jurisdiction over the appeal of circuit court "cases involving a constitutional issue," U.C.A., 1953, § 78–3–5, that have already been reviewed on appeal in the district courts is unconstitutional under Article VIII, § 9 of the Utah Constitution, which limits our jurisdiction over appeals from inferior courts to "cases involving the validity or constitutionality of a statute." This appeal should be dismissed because this case admittedly does not involve the validity or constitutionality of a statute.

It is astonishing that a jurisdictional question as basic as the one involved in this case was not settled definitively long ago. In fact, as is evident from the cases and statutes discussed in this and the majority opinion, there are cases on both sides of this question, contradictory reasoning in the opinions, and statutes in apparent conflict with the reasoning in some of the cases. What can be said without fear of contradiction is that most of the cases deciding the issue for or against jurisdiction do so either without recognizing the question as a serious legal issue or without explicit reasoning to disclose the basis of its resolution. In this circumstance, when the precedents are in hopeless conflict, it is appropriate to return to first principles to settle the issue. I therefore begin with the language and intent of the constitutional provision, in the context in which it was adopted.

When our Constitution became effective in 1896, there were no city courts or municipal courts. The only courts in the Utah Territory or in the new state were the Supreme Court, the district court, and the justices of the peace. The Constitution had specific provisions governing the jurisdiction and interrelationship of these courts and others that might be created under the constitutional authorization of "such other courts inferior to the Supreme Court as may be established by law." Article VIII, § 1. Thus, the Supreme Court had original jurisdiction to issue prescribed writs, and in other cases "appellate jurisdiction only .... " Article VIII, § 4. See *Holden v. NL Industries, Inc.,* Utah, 629 P.2d 428 (1981). The district court had original jurisdiction in all matters, civil and criminal, and "appellate jurisdiction from all inferior courts and tribunals, and a supervisory control of the same." Article VIII, § 7. The jurisdiction of justices of the peace was "as now provided by law, but the Legislature may restrict the same." Article VIII, § 8.

The constitutional provisions on appeal bring us directly to the subject at issue in this case. The first sentence of Article VIII, § 9 provides that "[f]rom all final judgments of the district courts, there shall be a right of appeal to the Supreme Court." Succeeding sentences define the scope of that appeal.

The last sentence of Article VIII, § 9 concerns appeals from inferior courts, referring specifically to the only inferior court in existence at that time: justices of the peace. The first clause grants a constitutional right to appeal from the judgment of the inferior court:

> Appeals shall also lie from the final judgment of justices of the peace in civil and criminal cases to the District Courts on both questions of law and fact, with such limitations and restrictions as shall be provided by law ....

The second clause makes the district court's judgment on an appeal from such a court final, with one stated exception:

> [A]nd the decisions of the District Courts on such appeals shall be final, except in cases involving the validity or constitutionality of a statute.

The purpose of the finality provision in Article VIII, § 9 was to limit the Supreme Court's jurisdiction on appeal to those significant cases involving the constitutionality of statutes, and to protect the Supreme Court from the consumption of time involved in having to entertain other appeals from inferior courts whose errors had already been subject to correction in the district court. This clearly appears from *Eureka City v. Wilson,* 15 Utah 53, 58–59, 48 P. 41, 43 (1897), where, in dismissing an appeal in a criminal case that originated in a justice's court, this Court explained:

> Under the territorial form of government, appeals were allowed from all final decisions of the district courts to the supreme court, and questions of both law and fact were reviewed; and whether a case was originally brought before a justice of the peace, or in the district court, was immaterial. 1 Comp.Laws Utah, p. 57. *This practice made it possible to appeal any case, no matter how insignificant the amount of the judgment, or how totally without merit the appeal or the cause of the appellant. It had a tendency to encourage profitless litigation, and consume the time of the appellate court without just cause.* Such practice was in vogue when the constitution was framed, and we must assume that the framers of that instrument were familiar with current history, and that they had knowledge of the practice and its effect. When, therefore, contrary to the former practice, the framers of the constitution provided that "the decision of the district courts" on appeals from judgments of justices of the peace "shall be final, except in cases involving the validity or constitutionality of a statute," *their evident object and intention were to obviate the evil to which the practice then existing was subject,* and yet provide a way by which statutory and constitutional questions which might arise in such cases could be reviewed by the appellate court. [Emphasis added.]

The foregoing explanation, which dates from the year the Constitution became effective and which has been quoted approvingly in succeeding cases,[1] is the only judicial explanation of the purpose of the finality provision in the last sentence of Article VIII, § 9.

The proper interpretation of the finality provision in the second clause of the last sentence of § 9 is also strongly suggested by the interpretation of the comparable provisions granting the right to appeal (first sentence and first clause of last sentence). In light of the entire context of the constitutional judicial structure summarized above, including the evident intent to guarantee all litigants the right to appeal to the next higher court, could the Legislature use its constitutional power to create an additional court of original jurisdiction inferior to the Supreme Court but call it something other than "district court" and thereby avoid the constitutional right of appeal guaranteed from that court to the Supreme Court? I think not. Similarly, could the Legislature use its constitutional power to restrict the jurisdiction of the justices' courts (Art. VIII, § 8) and then create another court inferior to the district court but call it something other than "justice of the peace" and thereby avoid the constitutional right of appeal that the last sentence of Article VIII, § 9 guarantees from a justice court to the district court? I think not.

For this purpose, "justices of the peace" as used in the first clause of the last sentence of § 9 must be equivalent to the "inferior courts and tribunals" to which § 7 refers in granting appellate jurisdiction to the district court. Thus, to implement the "appellate jurisdiction" § 7 grants the district court over "all inferior courts and tribunals," § 9's guarantee of the right to appeal should be read to reach "all inferior courts and tribunals," not just the "justices of the peace" specifically mentioned in that section. Section 9 mentions the only inferior court in existence at the time the Constitution was adopted, but its reference was illustrative, not exhaustive.

Under the foregoing interpretation of the right to appeal, the finality provision in the second clause of the last sentence of Article VIII, § 9 fulfills the limiting purpose explained in the *Eureka City* case: subject only to the stated exception, "the decision of the District Courts on such appeals [*i.e.*, from inferior courts] shall be final."

The actions of this Court in criminal cases, like the case now before the Court, have been consistent with the foregoing interpretation of Article VIII, § 9. Where a criminal case not involving the constitutionality of a statute or ordinance began in a court inferior to the district court and was appealed to the district court, this Court has routinely dismissed the further appeal to this Court on the basis of constitutional lack of jurisdiction or has otherwise held that this Court was without constitutional jurisdiction on appeal. Cited in the footnotes are examples of such dismissals of cases that began in justices' courts,[2] in a municipal court,[3] and in city courts.[4] There are even dicta or inferences to this effect in cases that began in the new circuit courts.[5]

---

1. *Crooks v. Fourth District Court,* 21 Utah 98, 59 P. 529 (1899); *Smith v. District Court,* 24 Utah 164, 66 P. 1065 (1901).

2. *State v. Munger,* Utah, 642 P.2d 721 (1982); *Vernal City v. Critton,* Utah, 565 P.2d 408 (1977); *State v. Robinson,* 23 Utah 2d 78, 457 P.2d 969 (1969); *Salina City v. Freece,* 61 Utah 574, 216 P. 1078 (1923); *State v. Olsen,* 18 Utah 484, 56 P. 22 (1899); *Eureka City v. Wilson,* 15 Utah 53, 48 P. 41 (1897).

3. *State v. Olsen,* 39 Utah 177, 115 P. 968 (1911).

4. *Tucker v. Banks,* Utah, 578 P.2d 13 (1978); *Logan City v. Carlsen,* Utah, 585 P.2d 449 (1978); *Salt Lake City v. West Gallery, Inc.,* Utah, 573 P.2d 1283 (1978); *State v. Sheldon,* Utah, 545 P.2d 513 (1976); *Salt Lake City v. Peters,* 22 Utah 2d 127, 449 P.2d 652 (1969); *Salt Lake City v. Granieri,* 16 Utah 2d 245, 398 P.2d 888 (1965); *Salt Lake City v. Perkins,* 9 Utah 2d 317, 343 P.2d 1106 (1959); *Salt Lake City v. Perkins,* 122 Utah 43, 245 P.2d 1176 (1952); *State v. Lyte,* 75 Utah 283, 284 P. 1006 (1930).

5. *State v. Stromquist,* Utah, 639 P.2d 171, 172 n. 1 (1981); *Layton City v. Glines,* Utah, 616 P.2d 588, 589 n. 1 (1980).

These dismissals do not mean that this Court is entirely without jurisdiction in cases that began in the inferior courts. In the exercise of our original jurisdiction in such cases, we have held that certiorari lies to correct a district court that exceeds its jurisdiction,[6] and mandamus lies to correct a district court that refuses to exercise its jurisdiction.[7] But these original writs have not been used to review alleged errors in the exercise of the district court's jurisdiction on appeal, since that would exceed the constitutional limits imposed on this Court by Article VIII, § 9.

At the same time, it must be conceded that there is also a line of authorities, beginning as early as *Salt Lake City v. Lee*, 49 Utah 197, 161 P. 926 (1916), that dismisses appeals of criminal cases commenced in the inferior courts on the stated ground that the appeal was impermissible under a statute rather than the constitutional provision, thus implying that this Court's jurisdiction could be enlarged by statute.[8] Though many of these rulings, including *Salt Lake City v. Lee* itself, are consistent with the *result* dictated by the finality provision in Article VIII, § 9, their *reasoning* is admittedly at odds with the constitutional interpretation articulated in this opinion and applied in the more numerous criminal cases cited in footnotes 2 through 5.

Since the conflicts of authority treated here are principally attributable to the provisions of statutes regulating appeals from inferior courts other than justices' courts, a brief examination of those statutes is in order.

There were no other inferior courts until 1901. In that year, the Legislature established municipal courts in cities of 15,000 to 40,000, and city courts in cities of the first class (30,000 or more). 1901 Utah Laws, chs. 109 and 112. Municipal courts had essentially the same jurisdiction as justices of the peace, their judges were expressly stated to be ex officio justices of the peace, and appeals from their judgments were pursuant to the same procedure prescribed for justices of the peace. In contrast, the city courts had a specific grant of jurisdiction (considerably beyond that granted to justices of the peace), and their judges (who had to be lawyers) were not ex officio justices of the peace. More importantly, for present purposes, their judgments could be appealed to the district courts under the same procedures as appeals from justices of the peace, but the statute added a special provision permitting civil appeals to be pursued to the Supreme Court where the judgment (soon amended to read "amount in controversy") exceeded $100. 1907 Utah Laws § 686x17.

In 1919, the municipal courts and justices of the peace were merged into the city courts in cities over 7,500, and the city court judges were expressly denominated ex officio justices of the peace. 1919 Utah Laws, ch. 34. The special appeal provision was continued, *e.g.*, U.C.A., 1953, § 78–4–17, and persisted in substance until the city court legislation was repealed by the Circuit Court Act in 1977. 1977 Utah Laws, ch. 77 (codified at U.C.A., 1953, §§ 78–4–1, *et seq.*).

Some criminal appeals were dismissed under the special appeal legislation, as in *Salt Lake City v. Lee*, discussed earlier, and a handful of civil appeals of cases begun in the city courts where the amount in controversy exceeded $100 came to this Court and were resolved on the merits, or the appeals

6. *Oregon Shortline R.R. v. District Court*, 30 Utah 371, 85 P. 360 (1906); *Hoffman v. Lewis*, 31 Utah 179, 187, 87 P. 167, 170 (1906).

7. *Silver City Mercantile Co. v. District Court*, 57 Utah 365, 195 P. 194 (1920); *Hoffman v. Lewis*, 31 Utah 179, 87 P. 167 (1906).

8. Among the numerous cases citing *Salt Lake City v. Lee* are *Logan City v. Blotter*, 75 Utah 272, 284 P. 333 (1930); *State v. Brown*, 75 Utah 37, 282 P. 785 (1928); and *State v. Roberts*, 56 Utah 136, 190 P. 351 (1920). *Also see Salt Lake City v. Perkins*, 122 Utah 43, 245 P.2d 1176 (1952), and *State v. Lyte, supra*, note 4, which dismiss appeals to this Court on alternative statutory grounds in addition to the constitutional basis of Article VIII, § 9.

were dismissed in reliance on the statute.[9] But in no instance was the constitutionality of the statute granting an appeal in a civil case where the amount exceeded $100 raised and discussed. These civil cases, and the statutes on which they rely, are therefore of little precedential value in comparison with the analysis of the constitutional language and purpose discussed earlier.

In sum, I conclude that the present circuit court, since it is a court inferior to the district court, is covered by the right of appeal granted and the finality provision imposed in the last sentence of Article VIII, § 9 of the Constitution.[10] As a result, the Supreme Court has no jurisdiction over this appeal, since it does not involve the validity or constitutionality of a statute. The appeal should therefore be dismissed.

HALL, C.J., concurs in the dissenting opinion of OAKS, J.

---

9. *Buckner v. Main Realty and Ins. Co.,* 4 Utah 2d 124, 288 P.2d 786 (1955); *Big Cottonwood Tanner Ditch Co. v. Kay,* 108 Utah 110, 157 P.2d 795 (1945); *Christensen v. Johnson,* 90 Utah 273, 61 P.2d 597 (1936); *Thomas v. District Court,* 66 Utah 300, 242 P. 348 (1925); *McCashland v. Keogh,* 32 Utah 11, 88 P. 680 (1906); *Garcia v. Free,* 31 Utah 389, 88 P. 30 (1906).

10. This reasoning is not meant to cast doubt upon this Court's jurisdiction to hear appeals in cases that began in the juvenile court, on which the Legislature has conferred jurisdiction "concurrent" with the district court, though specialized rather than general in its subject matter. *Anderson v. Anderson,* 18 Utah 2d 89, 92, 416 P.2d 308, 310 (1966); U.C.A., 1953, § 78–3a–16.

Nor does this reasoning resolve the constitutionality of an appeal to the Supreme Court of district court decisions in controversies that began in an administrative agency and were taken directly to the district court for review. The constitutionality of additional review in such cases may depend on whether the district court is exercising (1) original jurisdiction in reviewing an administrative determination or (2) appellate jurisdiction in reviewing the decision of an "inferior ... tribunal" exercising judicial power. Compare *Baker v. Department of Registration,* 78 Utah 424, 437–38, 3 P.2d 1082, 1088–89 (1931), with *Industrial Commission v. Evans,* 52 Utah 394, 402–03, 174 P. 825, 828–29 (1918).