2012 UT 34

**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Eric Leon BUTT, Jr., Defendant and Appellant.**

No. 20090655.

Supreme Court of Utah.

June 8, 2012.

Mark L. Shurtleff, Att'y Gen., Ryan D. Tenney, Asst. Att'y Gen., Salt Lake City, for appellee.

William L. Schultz, Monticello, for appellant.

Associate Chief Justice NEHRING, opinion of the Court:

¶ 1 Defendant Eric Butt was convicted of distributing harmful materials to a minor when he mailed rudimentary nude drawings of himself to his five-year-old daughter. On appeal, he argues that the evidence was insufficient to support his conviction because the State presented nothing more than the drawings themselves. Due to the broad grant of discretion ceded to the jury by the sufficiency of the evidence standard and by the "harmful to minors" statute, we affirm.

## BACKGROUND

¶ 2 Defendant was incarcerated in the San Juan County Jail on theft-related charges. From jail, he mailed two letters to his family. The letters were intercepted by the County Jail, which allowed inmates to mail letters but reserved the right to randomly inspect any outgoing mail.

¶ 3 The first letter was addressed to Defendant's wife. The envelope had a large pink heart drawn on it, and inside the heart were three letters: C, K, and S, presumably

standing for his wife Cammy, his eight-year-old son K.B., and his five-year-old daughter S.B. Defendant enclosed individual letters to his wife and children. At the bottom of the letter for S.B., he drew a picture of himself naked with a speech bubble stating, "I love you [S.B.]" coming from his mouth. Next to the nude drawing of himself, he wrote, "Love you, Dad" and "I have no idea why she wanted me to draw my w[ie]ner. But she insisted. Scary!!" Corporal Black, the prison guard on duty, intercepted this letter. After inspecting it, he took it to Deputy Alan Freestone, the deputy sheriff for the San Juan County Jail. That same day, Deputy Freestone met with Defendant to discuss the drawing; Defendant freely admitted that he drew the picture as a joke because his daughter had asked him to do so.

¶ 4 A few days later, Defendant mailed a second letter to his family. This letter was also addressed to his wife and also contained a drawn heart on it, with C, K, and S inside the heart. This envelope also contained three letters: one each to his wife, son, and daughter. On the bottom of the letter for S.B., Defendant drew another picture of himself naked. This drawing depicted him holding his daughter's buttocks up to his mouth. A speech bubble from her mouth said, "Oouch! Daddy don't Bite so hard Giggle giggle." A speech bubble from his mouth said, "Oh your butt taste so good." Above the drawing, Defendant wrote, "[S.B.], Hi beautiful girl. I miss you so much. I can't wait to bite your butt cheek. This is what it will look like. I love you." A prison guard also intercepted this letter and turned it over to Deputy Freestone. Deputy Freestone met with Defendant in the booking area of the jail to let him know that he did not think the drawing was appropriate. Defendant explained to Deputy Freestone that the drawing depicted a game that he played with his daughter where he bites and tickles her.

¶ 5 At some point after these letters were intercepted but before any formal charges were filed, Deputy Freestone asked Deputy Martha Johnson to ascertain the ages of Defendant's children. Deputy Freestone never explained why he wanted the ages and did not ask Deputy Johnson to get any other information or conduct any further investigation. Deputy Johnson approached Defendant in his jail cell and asked him how old his children were. He told her that his daughter was five and his son was eight. Deputy Johnson did not read Defendant his *Miranda* rights during this encounter. Deputy Johnson relayed Defendant's response to Deputy Freestone.

¶ 6 Defendant was charged with two counts of distributing harmful material to a minor under Utah Code section 76–10–1206. At trial, Defendant testified that he wrote both letters and drew both pictures. He acknowledged that although the letter was addressed to his wife, he intended his daughter to see his drawings. In his testimony, he stated that his daughter was five years old. He stated that he did not find the drawings offensive because his daughter had watched a documentary about cave drawings and asked him to draw a picture of himself naked like those in the documentary. With regard to the second letter, Defendant testified that his drawing depicted a game he played with his daughter involving biting and tickling. The jury convicted Defendant on both counts. Defendant appeals. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(b).

## STANDARDS OF REVIEW

¶ 7 We first consider Defendant's threshold argument that his Fifth Amendment rights were violated when Deputy Johnson asked Defendant how old his children were without issuing him *Miranda* warnings.[1] We review determinations of custodial interrogation for correctness, giving no deference to the trial court's decision.[2]

¶ 8 Defendant next contends that the evidence was not sufficient to prove the elements of the statute.

The standard of review for a sufficiency claim is highly deferential to a jury verdict. We begin by reviewing the evidence and

1. *See Miranda v. Arizona,* 384 U.S. 436, 437, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. *State v. Levin,* 2006 UT 50, ¶ 45, 144 P.3d 1096.

all inferences which may be reasonably drawn from it in the light most favorable to the verdict. We will reverse a jury verdict for insufficient evidence only if we determine that reasonable minds could not have reached the verdict.[3]

¶ 9 Finally, Defendant contends that the jury utilized the incorrect community standard. We conclude that Defendant waived this argument and do not address it on the merits.

## ANALYSIS

### I. DEFENDANT'S *MIRANDA* RIGHTS

¶ 10 Defendant asserts that his Fifth Amendment rights were violated when he was not read his *Miranda* rights before being asked the ages of his children—a piece of information that may have been readily attainable through a variety of sources but was nevertheless an element of the crime that had to be proved in order to convict.

¶ 11 The Fifth Amendment to the United States Constitution provides, "No person shall be ... compelled in any criminal case to be a witness against himself."[4]

The Fifth Amendment right to silence is a comprehensive privilege that can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. It protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used.[5]

■■■ ¶ 12 "To preserve this right, the U.S. Supreme Court has held that defendants subjected to custodial interrogation are entitled to a *Miranda* warning. Where such a warning is not given, any incriminating statements made by a defendant during the custodial interrogation are excluded from evidence."[6] "[C]ustodial interrogation occurs where there is both (1) custody ... and (2) interrogation. These two elements are interrelated."[7]

¶ 13 We have previously evaluated whether a defendant was in custody, noting that,

A person is in custody when the person's freedom of action is curtailed to a degree associated with formal arrest. The inquiry is objective and considers how a reasonable man in the suspect's position would have understood his situation. A suspect may understand himself or herself to be in custody based either on physical evidence or on the nature of the officer's instructions and questions. Therefore, we focus on both the evidence of restraint and on objective evidence of the officers' intentions.[8]

¶ 14 We have identified four considerations to aid us in determining whether an individual is "in custody": "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation."[9]

¶ 15 While we have attempted to define custody, we have not yet had the opportunity to consider the meaning of "custodial interrogation" where the suspect is already incarcerated for a different crime. We have therefore combed the nation for guidance on the applicability of *Miranda* in this situation.

■■■ ¶ 16 The traditional analysis is impaired when the suspect is already incarcerated, because the person's "freedom of action" is already curtailed. But a person who is incarcerated is not always "in custody" within the meaning of *Miranda*.[10] On the

---

3. *State v. Workman*, 2005 UT 66, ¶ 29, 122 P.3d 639 (citation and internal quotation marks omitted).

4. U.S. Const. amend. V.

5. *State v. Gallup*, 2011 UT App 422, ¶ 14, 267 P.3d 289 (alterations, emphasis, and internal quotation marks omitted).

6. *State v. Levin*, 2006 UT 50, ¶ 1, 144 P.3d 1096 (footnote omitted).

7. *Id.* ¶ 34.

8. *Id.* ¶ 35 (alteration, footnotes, and internal quotation marks omitted).

9. *Id.* ¶ 36 (internal quotation marks omitted).

10. *See Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 1188–89, 182 L.Ed.2d 17 (2012).

contrary, it is established that "not all instances of prison questioning fall within the protections of *Miranda*."[11] The United States Supreme Court recently explained:

> To determine whether a suspect was in *Miranda* custody we have asked whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. This test, no doubt, is satisfied by all forms of incarceration. Our cases make clear, however, that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.[12]

¶ 17 The test is whether a reasonable person would have felt he was free to leave:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.
>
> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have declined to accord talismanic power to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.[13]

The Court summarized that "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted."[14]

¶ 18 The Court applied this analysis to an inmate who had been removed from his prison cell and taken to a separate room to be interviewed.[15] He was not "restrained or threatened and was interviewed in a well-lit, average-sized conference room, where he was 'not uncomfortable.'"[16] He was offered food and water.[17] The interview lasted between five and seven hours, but he "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted."[18] Given these factors, the Court determined that he "was not taken into custody for purposes of *Miranda*."[19]

¶ 19 This factual scenario differs markedly from on-the-scene questioning, in which an officer spontaneously asks an inmate questions while pursuing another investigation.

---

11. *Cervantes v. Walker*, 589 F.2d 424, 428 n. 5 (9th Cir.1978); *see also United States v. Melancon*, 662 F.3d 708, 711 (5th Cir.2011) ("'[A] prison inmate is not automatically always 'in custody' within the meaning of *Miranda*, although the prison setting may increase the likelihood that an inmate is in 'custody' for *Miranda* purposes.") (alteration in original) (some internal quotation marks omitted); *United States v. Conley*, 779 F.2d 970, 973 (4th Cir.1985) ("'[A] prison inmate is not automatically always in 'custody' within the meaning of *Miranda*.").

12. *Maryland v. Shatzer*, —— U.S. ——, 130 S.Ct. 1213, 1224, 175 L.Ed.2d 1045 (2010) (citations and internal quotation marks omitted).

13. *Howes*, 132 S.Ct. at 1189–90 (alterations, citations, and internal quotation marks omitted).

14. *Id.* at 1192.

15. *Id.* at 1193.

16. *Id.*

17. *Id.*

18. *Id.* at 1192–93.

19. *Id.* at 1192.

For example, in *Cervantes v. Walker*,[20] one of the most-cited cases on the issue, the defendant was being moved from one jail cell to another following an altercation with a fellow inmate.[21] En route, he spent some time waiting in the jail library.[22] During his wait, his belongings were searched, pursuant to standard jail procedure when moving inmates.[23] During the search, the officer found a green odorless substance.[24] The officer immediately took the substance to the defendant, and asked him what it was.[25] The defendant promptly replied, "That's grass, man," at which point he was arrested.[26] To determine whether the inmate had been subjected to "custodial interrogation" for *Miranda* purposes, the Ninth Circuit established four considerations:

> [T]he language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting.[27]

Ultimately, the Ninth Circuit concluded that *Miranda* warnings were not required in that case because "this was an instance of on-the-scene questioning enabling [the officer] to determine whether a crime was in progress."[28] Subsequently, the Fourth Circuit embraced and elaborated on the Ninth Circuit's holding in *Cervantes* and evaluated, ultimately, "whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart."[29] Likewise following *Cervantes*, the Tenth Circuit similarly determined that *Miranda* warnings were not

required where an inmate "was not deprived of his freedom nor was he questioned in a coercive environment."[30]

¶ 20 These cases give us guidance, but none align exactly with the case before us. Although the record is sparse in its details, the suppression hearing in this case indicates that the questioning here was neither on-the-scene nor did it take place isolated from the general inmate population. It is clear that Deputy Johnson was sent deliberately to ask Defendant a pointed question that elicited a response concerning an element of the crime being investigated. Deputy Freestone, likewise, went directly to Defendant's jail cell to ask him questions about the letters.

¶ 21 To determine whether Defendant was entitled to *Miranda* warnings under these circumstances, we turn to the ultimate question of whether he "felt he … was … at liberty to terminate the interrogation and leave."[31] In doing so, we consider the "[r]elevant factors" outlined by the Supreme Court in *Howes v. Fields*: "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."[32] Weighing in favor of his liberty to leave are these points: Defendant was not subjected to coercion of any sort. He was not physically restrained in any way beyond being in his cell. He was neither summoned nor presented with evidence of his guilt. The interrogating officers in no way lied or deceived Defendant as to their purpose, although they did not announce their intentions. And the interrogations were extremely brief. Weigh-

---

**20.** 589 F.2d 424 (9th Cir.1978).

**21.** *Id.* at 426.

**22.** *Id.*

**23.** *Id.* at 426–27.

**24.** *Id.* at 427.

**25.** *Id.*

**26.** *Id.*

**27.** *Id.* at 428.

**28.** *Id.* at 429.

**29.** *Conley,* 779 F.2d at 973.

**30.** *United States v. Scalf,* 725 F.2d 1272, 1276 (10th Cir.1984).

**31.** *Howes,* 132 S.Ct. at 1189 (internal quotation marks omitted).

**32.** *Id.* at 1189 (citations omitted).

ing against it, however, is our concern that *no* defendant being interviewed in his prison cell would ever feel "free to leave." A defendant in his cell might, at most, feel free to remain silent, but would clearly not feel "free to leave." And in this case, the interrogations of Defendant were so brief, and the questions were so seemingly innocuous, he might not have realized that he *should* remain silent until after he had already answered the critical questions.

¶ 22 Despite our misgivings that a defendant being interviewed in his cell could feel free to leave, we conclude that the balance tips against requiring *Miranda* warnings in this case. Defendant's liberty was not restrained beyond his usual status as a jail inmate, nor was he coerced in any way. We therefore conclude that he was not "in custody" and *Miranda* warnings were not required.[33]

## II. SUFFICIENCY OF THE EVIDENCE

¶ 23 Next, Defendant challenges his conviction of distributing harmful material to a minor, in violation of Utah Code section 76–10–1206(1). Under that statute, "A person is guilty of dealing in material harmful to minors when, knowing . . . that a person is a minor, . . . the person intentionally . . . distributes . . . to a minor . . . any material harmful to minors[.]"[34]

■ ¶ 24 Defendant first contends that the evidence presented was not sufficient to establish that he "distributed" harmful material to a minor. Second, he contends that the evidence presented was not sufficient to es-

tablish that the material was "harmful" to a minor. When we evaluate the sufficiency of the evidence supporting a conviction, we do not sit as a second fact finder.[35] Rather,

[i]n evaluating the sufficiency of the evidence, an appellate court considers the evidence and the inferences that may reasonably be drawn from that evidence to determine whether there is a basis upon which a jury could find the defendant guilty beyond a reasonable doubt. [A] sufficiency of the evidence inquiry ends if there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made.[36]

■ ¶ 25 "We will reverse the jury's conviction only if the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted."[37]

### A. Whether Defendant "Distributed" Material to a Minor

■ ¶ 26 Defendant first contends that the evidence was not sufficient to support the element of "distribution." "Distribute" is defined by Utah Code section 76–10–1201(3) as "transfer[ring] possession of materials whether with or without consideration." In order to support a conviction for distributing harmful material to a minor, the State must prove that Defendant:

(a) engage[d] in conduct constituting a substantial step toward commission of the crime; and

---

33. We are troubled that law enforcement would ask an incarcerated individual a question that they knew shored up an element of a crime without informing the individual of his right to remain silent. Yet the nature of the questions and the information potentially elicited are elements that we would consider if we were analyzing whether Defendant was "interrogated." *See Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("[T]he definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (emphasis omitted)). Because *Miranda* warnings are only required where an individual is *both* interrogated and in custody, *see Levin*, 2006 UT 50, ¶ 34, 144

P.3d 1096, and because we conclude that Defendant was not in custody, we do not consider the nature of the questions and answers.

34. Utah Code § 76–10–1206(1)(a).

35. *State v. Haltom*, 2005 UT App 348, ¶ 21, 121 P.3d 42.

36. *State v. Graham*, 2011 UT App 332, ¶ 30, 263 P.3d 569 (second alteration in original) (citation and internal quotation marks omitted).

37. *State v. Hales*, 2007 UT 14, ¶ 36, 152 P.3d 321 (internal quotation marks omitted).

(b)(i) intend[ed] to commit the crime; or

(ii) when causing a particular result is an element of the crime, he act[ed] with an awareness that his conduct [was] reasonably certain to cause that result.[38]

¶ 27 Defendant argues that the State's evidence was not sufficient to prove that he took any substantial step to "distribute" the material to a minor because he did not transfer the drawings to his daughter, but to his wife, who would see the letters before the daughter and decide whether they were appropriate. He argues that, because of this, the State's evidence was not sufficient to prove that he *intentionally* took a substantial step towards distributing the material to his daughter—that, at most, the evidence proved that he intended for his wife to "open the letter and review the contents inside." However, Defendant never raised this issue in the trial court. "[C]laims not raised before the trial court may not be raised on appeal" unless the defendant demonstrates plain error or exceptional circumstances.[39] Defendant has argued neither. We therefore decline to address the issue on appeal.

### B. Whether the Material Was "Harmful to Minors"

¶ 28 Defendant next contends that the material distributed was not "harmful to minors." "Harmful to minors" is defined by Utah Code section 76–10–1201(5)(a):

"Harmful to minors" means that quality of any description or representation, in whatsoever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse when it:

(i) taken as a whole, appeals to the prurient interest in sex of minors;

(ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(iii) taken as a whole, does not have serious value for minors.

¶ 29 The plain language of this statute clearly indicates that a representation of nudity alone may not be "harmful." Instead, the representation of nudity must meet *each* of the three listed criteria. Defendant targets his argument at the first two of these criteria. He argues that the evidence was not sufficient to meet either subsection (i) or (ii): he contends the material did not "appeal[ ] to the prurient interest in sex of minors," and was not "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors." He does not argue that the material had any serious value for minors. Because the elements are listed in the conjunctive, Defendant's argument will be successful if he can prove that the evidence was not sufficient to prove either subsection (i) or (ii).

¶ 30 The language of this statute is derived from the United States Supreme Court case *Miller v. California*,[40] in which the Court set forth a three-part test for determining whether obscene material was protected by the First Amendment. In that case, the Court wrote:

The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.[41]

We adopted the *Miller* test and applied its rationale in *State v. Taylor*,[42] in which the defendant was charged with violating Utah's pornography statute, Utah Code section 76–10–1203. That statute bans the distribution of pornography, defined as follows:

---

**38.** Utah Code § 76–4–101(1).

**39.** *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346.

**40.** 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

**41.** *Id.* at 24, 93 S.Ct. 2607 (internal quotation marks omitted).

**42.** 664 P.2d 439, 440 (Utah 1983).

Any material or performance is pornographic if:

   (a) The average person, applying contemporary community standards, finds that, taken as a whole, it appeals to prurient interest in sex;

   (b) It is patently offensive in the description or depiction of nudity, sexual conduct, sexual excitement, sadomasochistic abuse, or excretion; and

   (c) Taken as a whole it does not have serious literary, artistic, political or scientific value.[43]

¶ 31 As the term is used in the pornography statute, " '[c]ontemporary community standards' means those current standards in the vicinage [sic] where an offense alleged under this part has occurred, is occurring, or will occur." [44] It is not a statewide standard, but a local standard, dependent on "the jurisdictional area from which the jury was drawn." [45] *Taylor* explains that "contemporary community standards," as it is used in the pornography statute, is a question for the jury:

   [E]ach juror makes its own factual determination on the question of whether specific material violates the community standard. The jurors may, and we assume they would, discuss among themselves the community standard and any particular juror might adopt any resulting con[s]ensus or rely upon his or her own understanding of the community standard.[46]

Further, "it is a factual determination in each obscenity case as to whether the particular material violates the community standard as viewed by the average person. There is no requirement of an independent factual determination of what the community standard on pornography is in the abstract." [47] Instead, "[a] juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes for making the required determination, just as he is entitled to draw on his knowledge of the propensities of a 'reasonable' person in other areas of the law." [48]

¶ 32 *Miller* and *Taylor* explain that whether something "appeals to the prurient interest" or is "patently offensive" is also a question for the jury.[49] However, "[t]he fact that the jury must measure patent offensiveness against contemporary community standards does not mean … that juror discretion in this area is to go unchecked." [50] *Miller* explained that there were some constitutional limits to material that could be found "obscene," and limited those materials to "hardcore" materials.[51] The goal of those limits was to ensure that "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct specifically defined by the regulating state law, as written or construed." [52] *Miller* gave examples of materials that were "patently offensive," including "representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated" and "representation[s] or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." [53] The United States Supreme Court later explained that

---

**43.** UTAH CODE § 76–10–1203(1).

**44.** *Id.* § 76–10–1201(2).

**45.** *State v. Int'l Amusements*, 565 P.2d 1112, 1113 (Utah 1977).

**46.** *Taylor*, 664 P.2d at 449.

**47.** *Id.*

**48.** *Hamling v. United States*, 418 U.S. 87, 104–05, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see also Int'l Amusements*, 565 P.2d at 1114.

**49.** *See Taylor*, 664 P.2d at 448 (" 'The phrasing of the *Miller* test makes clear that contemporary community standards take on meaning only when they are considered with reference to the underlying questions of fact that must be resolved in an obscenity case. The test itself shows that appeal to the prurient interest is one such question of fact for the jury to resolve. The *Miller* opinion indicates that patent offensiveness is to be treated in the same way.' " (quoting *Smith v. United States*, 431 U.S. 291, 300–01, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977))).

**50.** *Id.* (quoting *Smith*, 431 U.S. at 301, 97 S.Ct. 1756).

**51.** *Miller*, 413 U.S. at 27, 93 S.Ct. 2607.

**52.** *Id.*

**53.** *Id.* at 25, 93 S.Ct. 2607.

those examples "were not intended to be exhaustive, [but] they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is 'patently offensive' within the meaning of the obscenity test set forth in the *Miller* cases."[54] Inside those limits, however, the question of whether something is obscene is ultimately a question for the jury.

¶ 33 Defendant argues that we should adopt the " 'hard core' sexual conduct" rule to the case at hand and determine that the pictures in this case were not "hard core." We decline to do so. The *Miller* jurisprudence, and in Utah, the cases following *Taylor*, are informative and helpful. But they are not entirely controlling because they addressed the prohibition on adult pornography.

¶ 34 While the pornography statute is similar to the "harmful to minors" statute, it is not identical. The harmful to minors statute does not ban material that is "patently offensive"—instead, it bans material that "is patently offensive *to prevailing standards in the adult community as a whole* with respect to what is suitable material for minors."[55] Thus, the determination of whether something is "patently offensive" in the context of the "harmful to minors" statute is not determined solely by the *Miller* description of offensive material, but is specifically couched in terms of the community's standards. The language of the statute plainly indicates that the legislature has relinquished its ability to define the scope of words like "harmful," "prurient," and "patently offensive," and delegated that responsibility to the jury. To be clear, a jury may not deem material to be proscribed by section 76–10–1201 without limit. At some point, the Constitution will step in to mark the outer limit of what a jury may find to be criminally actionable. Just as *Miller* recognizes that the Constitution will not permit a jury to find all material obscene for adults, likewise, the Constitution will inevitably block a jury's impulse to criminalize certain material as harmful to minors. However, Defendant has not presented a viable argument that the statute under which he was convicted exceeds the bounds set by the Constitution, and we therefore do not define those parameters today.

¶ 35 We have previously commented on the policy supporting this statute. In *State v. Burke*, one of the few cases to address this statute, we determined that the phrase "prurient interest in sex of minors" was not unconstitutionally vague.[56] We noted a "legislative purpose to keep harmful materials away from minors simply because they are minors," even though "adults may not be affected because of maturity."[57] We quoted the United States Supreme Court:

> [M]aterial which is protected for distribution to adults is not necessarily constitutionally protected from restriction upon its dissemination to children. In other words, the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined. Because of the State's exigent interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare and morals of its community by barring the distribution to children of books recognized to be suitable for adults.[58]

¶ 36 Here, Defendant contends that the State's evidence was not sufficient to support his conviction. The *only* evidence that the State presented was the letters themselves. The State did not present any evidence of the meaning of "harmful," or any of its subparts, including "prurient" or "patently offensive." Instead, the jury instructions explicitly stated that the determination of "harmful" was exclusively the province of the jury. Defendant has not challenged the jury instructions on appeal.

---

54. *Hamling*, 418 U.S. at 114, 94 S.Ct. 2887.

55. Utah Code § 76–10–1201(5)(a)(ii) (emphasis added).

56. 675 P.2d 1198, 1200 (Utah 1984) (per curiam).

57. *Id.* at 1199.

58. *Id.* at 1199–200 (alteration in original) (quoting *Ginsberg v. New York*, 390 U.S. 629, 636, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)).

¶ 37 The State, of course, carries the burden of showing that the material meets the given elements.[59] By explicit statutory language, however, the State is not required to introduce expert witness testimony as to whether the material is harmful to minors:

> Neither the prosecution nor the defense shall be required to introduce expert witness testimony as to whether the material or performance is or is not harmful to adults or minors or is or is not pornographic, or as to any element of the definition of pornographic, including contemporary community standards.[60]

¶ 38 If the State chooses "not to put on expert testimony, or any evidence, as to the community standard, it assumes the risk of a juror's not being able to arrive at such a community standard and voting to acquit a defendant." [61] We have the converse situation in this case: the State presented only the pictures at issue and left the determination of "harmfulness" up to the jury. Because the assessment of whether the evidence is "harmful" is a question for the jury, we cannot conclude that the evidence was insufficient to support a conviction. Instead, the State presented the pictures and asked the jury to decide whether they were harmful. The jury, acting within its discretion, decided they were.

¶ 39 As an appellate court, our role in reviewing a sufficiency of the evidence claim is simply to "consider[ ] the evidence and the inferences that may reasonably be drawn from that evidence to determine whether there is a basis upon which a jury could find the defendant guilty beyond a reasonable doubt." [62] In a "harmful to minors" case, it is left to the jury to decide for itself what is harmful and what is not. We therefore conclude that the State's presentation of only the drawings in question falls within the parameters of the "harmful to minors" statute, and that the jury reasonably drew the inference that the material met the elements of "harmful."

## III. THE COMMUNITY STANDARD

¶ 40 Defendant next asserts that "the jury utilized the incorrect community standard." But rather than showing that in fact the jury utilized the incorrect community standard, he contends that the *jury instruction* incorrectly explained the community standard. Specifically, he argues again that the jury instruction "should have included the kinds of conduct that amount to patently offensive, which are the hard core types of conduct given in *Miller*." He concludes that because the jury instruction did not include this information, "the jury did not rely upon the proper community standard and error occurred."

¶ 41 The jury instruction was explicit that jurors must apply a community standard, rather than rely on their own individual preferences:

> As a juror in this case you are required to utilize the perspective of the average person and in the process put aside your own particular tolerance or lack thereof of the material in question. You must apply the community standard without your own sensitivities so coloring your perspective as to render the notion of a community standard meaningless.

¶ 42 However, Defendant's attack on the jury instruction fails because he did not object to the instruction below. In fact, not only did he not object, but the instruction is identical to the one he proposed on the matter.[63] He cannot now claim error:

---

59. *See, e.g., Taylor,* 664 P.2d at 449 ("The State does have the burden of showing that the material has violated the community standard.").

60. U⊤ᴀʜ Cᴏᴅᴇ § 76–10–1203(3).

61. *Taylor,* 664 P.2d at 449–50.

62. *Graham,* 2011 UT App 332, ¶ 30, 263 P.3d 569.

63. He did, however, object when the trial court refused to instruct the jury that if any particular

juror determined that he or she could not arrive at a community standard, then the jury must acquit. The trial judge determined that this instruction was unnecessary because the instructions already stated, "If the State has failed to prove any one of those elements beyond a reasonable doubt, you should find defendant not guilty of that count." In discussing Defendant's objection, the trial court stated, "I think that amounts to telling jurors that they have to decide the case for themselves, and we've already told [them] that.... I don't think you have to tell

While a party who fails to object to or give an instruction may have an instruction assigned as error under the manifest injustice exception, a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error. Accordingly, a jury instruction may not be assigned as error even if such instruction constitutes manifest injustice if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction.[64]

Defendant is therefore barred from challenging the jury instruction. And he has presented us with no other basis for concluding that the jury actually utilized the incorrect community standard. Accordingly, we reject his argument on this point.

## CONCLUSION

¶ 43 First, Defendant was not "in custody" for purposes of *Miranda* and therefore his *Miranda* rights were not violated. Next, in reviewing the sufficiency of the evidence, our sole responsibility is to consider the evidence and any reasonable inferences drawn therefrom. We conclude that the evidence was sufficient to support the jury's conclusion that Defendant "distributed" the material to a minor. We also conclude that the evidence was sufficient to support the jury's conclusion that the material was "harmful." Finally, we decline to reach Defendant's argument that the jury used the incorrect community standard. He has challenged the jury instruction on appeal but did not preserve his challenge below, and he has not otherwise presented us with evidence to conclude that the jury in fact used an incorrect community standard. Affirmed.

Associate Chief Justice NEHRING authored the opinion of the Court, in which

---

Chief Justice DURRANT, Justice DURHAM, Justice PARRISH, and Justice LEE joined.

---

jurors that if you don't find one of the—I don't think you have to keep repeating, 'If you don't find one of the elements you vote to acquit.' We say that one time. That's the truth, and you [defense counsel] can mention as much as you want in your argument[.]"

64. *State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742 (citation and internal quotation marks omitted).