**2023 UT App 149**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
WILLIAM ALLEN UPTAIN,
Appellant.

Opinion
No. 20210766-CA
Filed December 14, 2023

Seventh District Court, Castle Dale Department
The Honorable Jeremiah Humes
No. 211700031

Wendy Brown, Debra M. Nelson, and
Benjamin Miller, Attorneys for Appellant

Sean D. Reyes and Michael D. Palumbo,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 A seventy-two-year-old widow living alone was subjected to a late-night home invasion and assault. Aware that William Allen Uptain, a known drug addict, lived nearby, law enforcement officers developed a hunch that Uptain might be the perpetrator. Sitting down for an interview with Uptain was easy enough—he was already in jail on drug charges. After isolating Uptain in a booking area of the jail, an officer, without providing *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), started interviewing Uptain, mainly about drug activity in the community. The officer then changed gears and brought up the home invasion case, to which Uptain spontaneously confessed. Uptain was then given *Miranda* warnings and confirmed his

confession. Now having been convicted, Uptain claims that his trial counsel (Counsel) was ineffective for failing to move to suppress his confessions and that he was prejudiced by this failure as the State had no other evidence of his guilt. We agree with Uptain's claims, vacate his convictions, and remand the case for such proceedings as may now be appropriate.

## BACKGROUND

¶2    Police in Green River, Utah, had an unsolved home invasion burglary. One February night, an unidentified man broke into the home of a seventy-two-year-old widow (Vicky[1]), who lived there alone. Vicky heard her dog barking, and she looked up to see a man standing at her kitchen door. The man "had on a full face ski mask, dark in color, a black sweater, khaki colored pants, and cloth-covered gloves." The invader ran toward her, grabbed her by the hair, yanked her out of her chair, and grasped her by the neck, warning, "Don't scream. All I want is money." After saying that she had none, he shoved her back into the chair and exited toward the kitchen door. Vicky ran after him because she had seen him take her purse. She grabbed his sweater in an attempt to stop him, at which point he turned around and slugged Vicky in the chest. Vicky fell to the floor but got up and ran after him again as he fled out the door. She went to her back porch to determine in which direction he went, but it was too dark. She returned inside and called the police.

¶3    After spending several minutes gathering information from Vicky, the responding officer drove around the surrounding streets looking for a suspect. Another officer joined in the search, but they located no one. The officers gathered no fingerprints, fiber evidence, or other forensic evidence. They were unable to find any footprints because the ground was too hard for an

---

1. A pseudonym.

impression to be left. And there was no video evidence available from surrounding residences.

¶4      The police did have some suspicions about Uptain being involved in the home invasion. But when asked about Uptain, Vicky responded that she did not know him. Still, Uptain's name, among others, was "floated as a possible suspect in the home invasion burglary," but the police did not "have any specific evidence tying him" to the crime.

¶5      Uptain had some outstanding warrants that had "nothing to do" with the home invasion. Police arrested Uptain on these warrants on March 4.

¶6      On March 15, a local drug task force agent (Detective) interviewed Uptain in the booking area of the jail. Detective was aware of the home invasion burglary through "normal conversation with other detectives and with [his] supervisors requesting . . . follow-up with investigations." He also knew that Uptain "lived in very close proximity" to Vicky.

¶7      Detective and another officer were present for the interview with Uptain. Detective said he wanted to talk to Uptain about drug activity in Green River, including seeking information about users and dealers. Detective told Uptain that Green River had a serious drug problem that he was trying to address. Uptain, apparently offering his assistance, asked Detective, "What do you need?" Detective responded,

> Whatever you can freaking give me, man. . . . [Y]ou got nobody in [this jail]. You got nobody anywhere. . . . [T]hat's why we came out here. . . . [The other inmates] don't know why you're out here. They know you got court tomorrow is what we were talking about . . . . So, yeah, don't worry about that. *I'm not going to burn you*.

(Emphasis added.) As they continued talking about various aspects of the drug activity in the area, Detective stated,

> Well, I appreciate honesty. And really you could be honest with me and tell me about other stuff, even other stuff you did . . . . *I'm not going to hang you up over that*. Like, if there's something serious, we'd work through it. Pretty much everything else, I'm not worried about.

(Emphasis added.) They continued to talk about Uptain's plans for pursuing drug treatment when he got out of jail and how he might assist Detective in addressing the drug problem in the area. At this point, Detective's phone rang. After completing the call, Detective returned to the interview but pivoted to the home invasion:

> *Detective*: So I've got one thing that I'm hoping that you can help me out with. Happened the middle of last month . . . middle of February. Do you know [Vicky]?
>
> *Uptain*: Who? . . . A guy?
>
> *Detective*: No. . . . [She lives] kind of through the field from you guys, going north.
>
> *Uptain*: No, I don't know her, but, yeah . . . .
>
> *Detective*: [Oh] you know what I'm talking about?
>
> *Uptain*: Yeah. And I regret it so much, man. I know I need help.
>
> *Detective*: Okay. So that was—
>
> *Uptain*: I was waiting for you to ask me about that.

. . . .

> *Detective*: So let me tell you this. . . . I didn't even ask you and you were out with it. It's perfectly clear where your mind is right now and it's probably the clearest it's been in a while.
>
> . . . .
>
> So I got my hands tied a little bit on this, and so I will have to bring this . . . up my chain of command. . . . But I'm hoping that it will just work out the best way it can. . . .
>
> So before you tell me anything, we'll do this, just so . . . you're legit. Okay. You have the right to remain silent . . . .

¶8    After Detective completed the *Miranda* recitation, Uptain confirmed that he understood the corresponding rights and agreed to "keep talking" to Detective. Uptain then shared the details of the home invasion burglary.

¶9    Uptain was charged with robbery and aggravated burglary. He filed a pro se motion to dismiss, arguing that there was no evidence apart from his confession to support a conviction. He also argued—albeit somewhat nebulously and citing the Fourth Amendment instead of the Fifth Amendment—for a "suppression hearing." He filed a second similar motion a few days later. The district court refused to rule on the pro se motion because Uptain, who was represented by legal counsel, had not obtained Counsel's endorsement.

¶10    Uptain then filed two more pro se motions seeking "new and sufficient counsel," arguing, as relevant here, that Counsel had not sought an evidentiary hearing or spoken to him about pretrial motions. The court denied the first motion for new

counsel because Uptain "provided no legal conflict nor suggested that the situation could not be resolved by additional meetings with [Counsel] prior [to] trial." And Uptain, on the morning of trial, withdrew his second motion.

¶11 During the trial, Vicky, the responding officer, and Detective testified to the events described above. During Detective's testimony, the State played the portion of Uptain's interview in which he confessed to the home invasion. During the cross-examination of Detective, Counsel played additional portions of the interview leading up to Uptain's confession.

¶12 In closing, Counsel argued that the case boiled down to Uptain's confession to the home invasion. But Counsel pointed out that the information in Uptain's responses was "rambling" and possibly inaccurate. Counsel also pointed out that Uptain made the incriminating statements only after Detective told him that he wouldn't "hang him up" and that Uptain was "saying whatever" he needed to say to get into drug treatment.

¶13 The jury convicted Uptain as charged, and he was sentenced to prison. Uptain appeals.

ISSUE AND STANDARD OF REVIEW

¶14 The sole issue presented is whether Counsel rendered ineffective assistance when he did not file a motion to suppress Uptain's confession. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up), *cert. denied*, 525 P.3d 1254 (Utah 2022).

ANALYSIS

¶15     Uptain argues that his constitutional right to effective assistance was violated when Counsel failed to file a motion to suppress his confession. He asserts that if Counsel had filed a motion to suppress, all his statements—both before and after *Miranda* warnings—would have been suppressed. More specifically, he contends that his "pre-*Miranda* statements should have been suppressed, because they were obtained absent the required warnings regarding [his] Fifth Amendment rights" and that "his post-*Miranda* statements should have been suppressed, because they were the result of an impermissible two-step interrogation."

I. The Questioning of Uptain Required *Miranda* Warnings

¶16     In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court gave "concrete constitutional guidelines for law enforcement agencies and courts to follow" when conducting custodial interrogations. *Id.* at 441–42. "Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings." *Dickerson v. United States*, 530 U.S. 428, 435 (2000). These warnings are (1) that a suspect has the right to remain silent, (2) that anything a suspect says can be used in a court of law, (3) that a suspect has the right to an attorney, and (4) that a suspect who cannot afford an attorney has the right to be appointed one prior to any questioning. *Id.* Thus, in articulating this right, "*Miranda* conditioned the admissibility at trial of any custodial confession on warning" suspects of their rights, and the "failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion).

A.    Uptain Was Subject to a Custodial Interrogation

¶17    "By custodial interrogation," the *Miranda* court clarified that it meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. There is no doubt here that Detective was the one who initiated contact with Uptain and asked him questions during the jailhouse interview. And while it might seem obvious that Uptain—being held in jail—was in custody, that conclusion cannot be hastily drawn. Indeed, in *Howes v. Fields*, 565 U.S. 499 (2012), the Supreme Court has clarified that as "used in . . . *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Id.* at 508–09. Instead of concluding that a suspect is in custody from the mere fact of incarceration, *Howes* explained that to determine "whether a person is in custody" for the purposes of *Miranda*, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (cleaned up). Then, having made this determination, the second question is to establish "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

¶18    Relying on *Howes*, the State insists that Counsel could have concluded that Uptain was not in custody for the purpose of *Miranda*. *Howes* involved an individual (Fields) who was questioned while incarcerated. *Id.* at 502. Fields was escorted one evening by a corrections officer to a conference room, where two sheriff's deputies questioned him for around six hours about a crime that had occurred before his incarceration. *Id.* at 502–03. At the beginning of the interview, Fields was told he was free to return to his cell. And later in the interview, he was again told that he could leave whenever he chose. *Id.* at 503. *Miranda* warnings were never given to Fields. *Id.* at 504. Fields eventually confessed

to the crime in question. *Id.* at 503. Over Fields's objection, the confession was introduced at trial, and Fields was convicted by a jury. *Id.* at 504.

¶19    The state appellate court affirmed, ruling "that Fields had not been in custody for purposes of *Miranda* during the interview, so no *Miranda* warnings were required" and emphasizing "that Fields was told that he was free to leave and return to his cell but that he never asked to do so." *Id.* The state supreme court denied certiorari review. *Id.*

¶20    Fields filed a petition for a writ of habeas corpus in federal district court, which granted relief, and the circuit court affirmed, "holding that the interview in the conference room was a 'custodial interrogation' within the meaning of *Miranda* because isolation from the general prison population combined with questioning about conduct occurring outside the prison makes any such interrogation custodial *per se*." *Id.*

¶21    The Supreme Court granted certiorari. *Id.* at 505. It reversed the federal appellate court: "[O]ur decisions do not clearly establish that a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison." *Id.* at 508. And the Court continued,

> Not only does the categorical rule applied below go well beyond anything that is clearly established in our prior decisions, it is simply wrong. The three elements of that rule—(1) imprisonment, (2) questioning in private, and (3) questioning about events in the outside world—are not necessarily enough to create a custodial situation for *Miranda* purposes.

*Id.* The Court concluded, "Taking into account all of the circumstances of the questioning—including *especially the*

*undisputed fact that* [*the*] *respondent was told that he was free to end the questioning and to return to his cell*—we hold that [the] respondent was not in custody within the meaning of *Miranda.*" *Id.* at 517 (emphasis added).

¶22    In this case, the State relies heavily on *Howes*, but its reliance is oversold. Indeed, *Howes* has several distinguishing features from the case at hand.

¶23    The result in *Howes* is best understood by its context, which somewhat limits its relevance to our analysis. As a threshold matter, *Howes* was a federal habeas case and was thus subject to a highly deferential standard of review. *Id.* at 502; *see Felkner v. Jackson*, 562 U.S. 594, 598 (2011). Moreover, *Howes* resolved an insular issue, namely, whether the federal appellate court had erred in holding that Supreme Court "precedents clearly establish that a prisoner is in custody within the meaning of *Miranda . . .* if the prisoner is taken aside and questioned about events that occurred outside the prison walls." *Howes*, 565 U.S. at 502. The Supreme Court said isolated questioning about outside events was not enough; instead, something more was needed to constitute custodial interrogation. *Id.* at 508–09

¶24    And that something more is the second distinguishing characteristic—the one the Supreme Court denominated as the "[m]ost important" circumstance, *id.* at 515 ("These circumstances [weighing in favor of custodial interrogation], however, were offset by others. *Most important*, [the] respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." (emphasis added))—between the situation in *Howes* and the case at hand. The prisoner in *Howes* was expressly told two times that he was free to leave the questioning. *Id.* at 503. This circumstance is noticeably lacking from Uptain's questioning. And this difference is of no small import. Courts applying *Howes* have consistently pointed to whether inmates were told that they were

free to leave as being a key factor in determining whether an interrogation was non-custodial in nature. *See Taylor v. Commonwealth*, 611 S.W.3d 730, 743 (Ky. 2020) ("Although the interrogation here was relatively short, and the defendants were released back to their cells at the end of the interrogation, when viewing the circumstances in their totality, the atmosphere was coercive in nature, and the defendants should have been *Mirandized* prior to interrogation due to the use of force, physical restraints, the interrogation occurring directly after a crime . . . , and that neither were told they were *free to leave*." (emphasis added)); *People v. Krebs*, 452 P.3d 609, 640 (Cal. 2019) ("[The] defendant was, in fact, subject to the coercive pressure associated with interrogation. At no point was [the] defendant told that he could leave and go back to his cell at the county jail whenever he wanted." (cleaned up)); *id.* at 639 (noting that in *Howes* the Supreme Court "thought the most important factor was that the prisoner had been told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted" (cleaned up)); *United States v. Mattox*, No. 3:17-CR-008, 2018 WL 3622777, at *4 (M.D. Pa. July 30, 2018) (concluding that an interrogation was custodial within the meaning of *Miranda* after observing that "the most important factor enumerated by *Howes* was not present, that is, [the inmate] was never told he could leave and go back to his cell whenever he wanted" (cleaned up)); *Jackson v. Barnes*, No. CV 04-8017, 2016 WL 11601265, at *9 (C.D. Cal. Feb. 4, 2016) (noting that a factor that "decisively [tilted] the analysis towards a finding that *Miranda*'s custody requirement was met" was that the officer "did not inform [the plaintiff] that he was free to end the interview at any time and return to his prison cell"), *report and recommendation adopted*, No. CV 04-08017, 2016 WL 1531252 (C.D. Cal. Apr. 13, 2016); *Simpson v. Jackson*, No. 2:06-CV-127, 2014 WL 5824895, at *19 (S.D. Ohio Nov. 10, 2014) ("Additionally, unlike the situation in *Howes,* where police repeatedly told [the inmate] he was free to leave and return to his cell, [the inmate here] was not."); *MacKendrick v. State*, 112 So. 3d 131, 140 (Fla. Dist. Ct. App. 2013)

(determining that an interrogation was custodial, in part, because an inmate was never told that "he was free to stop talking or leave the room," leading the court to agree that the inmate "did not believe he was free to stop talking, to end the interview, or to return to his cell anytime").[2]

---

2. Only one Utah case has relied on *Howes* for the *Miranda* custody analysis of an incarcerated individual. *See State v. Butt*, 2012 UT 34, ¶¶ 10–22, 284 P.3d 605. However, the facts involved in *Butt* are distinguishable from the facts at issue here. In *Butt*, the inmate was not removed from the general population to a different area for the interview. *Id.* ¶ 5. Instead, he was asked a single question while in his own cell about the ages of his children. *Id.* ¶¶ 5, 21. The *Butt* court concluded, "Despite our misgivings that a defendant being interviewed in his cell could feel free to leave, we conclude that the balance tips against requiring *Miranda* warnings in this case. [The defendant's] liberty was not restrained *beyond his usual status* as a jail inmate, nor was he coerced in any way." *Id.* ¶ 22 (emphasis added). In contrast, Uptain was restrained beyond his usual status because he was removed from the general population, placed in the booking area, and never told he was free to leave or that he could decline to answer questions.

Other Utah cases have relied on *Howes* for questioning that took place in other settings. *See State v. Fullerton*, 2018 UT 49, ¶¶ 6, 15–36, 428 P.3d 1052 (interview at a police station); *State v. Goddard*, 2021 UT App 124, ¶¶ 41–52, 501 P.3d 1188 (questioning in an alley), *cert. denied*, 505 P.3d 55 (Utah 2022); *State v. Fredrick*, 2019 UT App 152, ¶¶ 27–39, 450 P.3d 1154 (interview at a police station), *cert. denied*, 458 P.3d 748 (Utah 2020); *State v. MacDonald*, 2017 UT App 124, ¶¶ 19–37, 402 P.3d 91 (interviews at a police station); *State v. Reigelsperger*, 2017 UT App 101, ¶¶ 40–59, 400 P.3d 1127 (interview at a mental health facility), *cert. denied*, 409 P.3d 1048 (Utah 2017); *State v. Heywood*, 2015 UT App 191, ¶¶ 47–55, 357 P.3d 565 (questioning at a suspect's residence); *State v. Mills*,

(continued…)

¶25 Here, we conclude that Uptain was subject to a custodial interrogation. He was taken from his cell to be interviewed in a different room in the booking area. He was alone in that room with two detectives. Uptain was isolated from his peers in the general population. And most importantly, Detective never told Uptain that he was free (1) not to answer the questions or (2) to end the questioning—at least until Detective read *Miranda* warnings to Uptain *after* he had already begun to confess to the home invasion.

### B. The Statements Uptain Made to Detective Were Inadmissible

¶26 Given our determination that Uptain was subject to custodial interrogation, it follows that he was entitled to receive *Miranda* warnings prior to questioning. And absent these warnings before custodial questioning commenced, his statements should have been excluded. *See Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion) ("[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."). As we will explain, this conclusion applies to statements Uptain made both before Detective's recitation and after the recitation.

### 1. Uptain's Pre-*Miranda* Statements

¶27 "[T]he admissibility in evidence of any statement given during custodial interrogation of a suspect [depends] on whether the police provided the suspect" with *Miranda* warnings. *Dickerson v. United States*, 530 U.S. 428, 435 (2000). As we have already explained, Uptain was subject to custodial interrogation. And there is no dispute that Detective did not provide *Miranda* warnings until after he turned the questioning to the topic of the

---

2012 UT App 367, ¶¶ 16–24, 293 P.3d 1129 (questioning via a long-distance telephone call), *cert. denied*, 300 P.3d 312 (Utah 2013).

home invasion and after Uptain said that he regretted his involvement in the event and was wondering when Detective was going to bring it up.

¶28　This sequence of events was in direct violation of *Miranda*'s explicit directive: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Detective failed to provide *Miranda* warnings prior to his questioning, giving rise to a violation of Uptain's constitutional rights "upon the admission of unwarned statements into evidence at trial." *United States v. Patane*, 542 U.S. 630, 641 (2004).

2.　　　Uptain's Post-*Miranda* Statements

¶29　Detective eventually gave *Miranda* warnings after it became apparent Uptain was confessing to the home invasion. But it was too late. To allow Uptain's post-*Miranda* statements into evidence would constitute an end run around the warning requirement and do violence to the privilege against self-incrimination.

¶30　This issue was addressed in *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion), where the Supreme Court said in a four-justice plurality opinion that "midstream recitation of warnings after interrogation and unwarned confession [do] not effectively comply with *Miranda*'s constitutional requirement," making "a statement repeated after a warning in such circumstances . . . inadmissible." *Id.* at 604. In *Seibert*, a woman was arrested and taken to a police station. *Id.* The questioning began without *Miranda* warnings, and she eventually admitted to the crime. *Id.* at 604–05. The officer then gave *Miranda* warnings, obtained a waiver, and continued questioning, confronting her with her pre-*Miranda* statements. *Id.* at 605. She again confessed to the crime. *Id.* Before trial, she sought to exclude both her pre-

*Miranda* and post-*Miranda* statements. *Id.* The officer who conducted the interview testified at the suppression hearing "that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: *question first, then give the warnings*, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605–06. The trial court suppressed the pre-*Miranda* statements but admitted the post-*Miranda* responses. *Id.* at 606.

¶31　The suspect was convicted, but the state supreme court reversed the conviction, explaining that "where the interrogation was nearly continuous, . . . the second statement, clearly the product of the invalid first statement, should have been suppressed." *State v. Seibert*, 93 S.W.3d 700, 701 (Mo. 2002) (en banc), *aff'd sub nom. Missouri v. Seibert* 542 U.S. 600 (2004). The United States Supreme Court affirmed. *Missouri v. Seibert*, 542 U.S. at 617; *id.* at 618–22 (Kennedy, J., concurring in judgment). The Court explained,

> [T]he reason that [the] question-first [technique] is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.

*Id.* at 613 (plurality opinion). Given this concern, the Court offered guidance on how to resolve situations involving statements that are the fruit of the question-first technique:

The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611–12. The Court went on to warn that the question-first technique reveals "a police strategy adapted to undermine the *Miranda* warnings" and challenge "the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 616–17.

¶32 This is exactly what happened to Uptain. As the *Seibert* court explained, "[t]he object of [the] question-first [technique] is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. Thus, even though Detective eventually gave *Miranda* warnings, they came too late to be effective. Uptain's rights had already been violated to such an extent that they could not be restored by Detective's late-in-time effort. As Uptain points out, "the successive interrogation . . . was immediate in time and identical in content." At the very least, for Uptain's post-*Miranda* statement to have been admissible,

substantial curative measures would have been necessary. But no such measures were taken to ensure Uptain understood that his pre-*Miranda* statements in no way compelled him to continue answering questions.[3] Accordingly, Uptain's post-*Miranda* statements were also inadmissible.

## II. Counsel Rendered Ineffective Assistance

¶33 To succeed on a claim of ineffective assistance of counsel, an appellant must satisfy both prongs of the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient," such that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. "Second, the defendant must show that the deficient performance prejudiced the defense," *id.* at 687, meaning "that there is a reasonable probability that, but for

---

3. As Justice Kennedy explained,

> Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning statements are inadmissible and the conviction cannot stand.

*Missouri v. Seibert*, 542 U.S. 600, 622 (2004) (Kennedy, J., concurring in judgment) (cleaned up).

counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

A.     Counsel Rendered Deficient Performance

¶34     The State contends that Uptain "has not provided, nor sought to provide, any evidence of [Counsel's] actual decision-making process." Quoting *Burt v. Titlow*, 571 U.S. 12 (2013), the State argues that "it should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* at 23 (cleaned up). This apparent deficiency, the State argues, should "be construed in favor of a finding that counsel performed effectively." (Quoting *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92.) From this, the State argues that this court "must also presume that [Counsel] knew of additional facts not contained in the record, which further support that reasonable decision, and which [Counsel] also reasonably took into consideration."

¶35     But the State goes a step too far. This is not a case where there was an "absence of evidence" of Counsel's deficient performance. *See Burt*, 571 U.S. at 23. The record may not have included anything about Counsel's internal decision-making process not to seek exclusion of the confession, but insofar as our analysis is concerned, it doesn't really need to. This is because the record is in no way silent as to Counsel's deficiency; nor does the record require us to make an inferential leap to fill in the gaps. Rather, the record contains facts that paint a complete picture of Counsel's objectively evident deficient performance. The record is unambiguous that (1) Uptain was removed from the general jail population; (2) Uptain was never told he was free to leave or not continue the interview; (3) Detective developed a rapport with Uptain in discussing how Uptain could help him reduce the flow

of drugs into the area; (4) Detective did not give Uptain *Miranda* warnings prior to asking about the home invasion; (5) Uptain, perhaps finding comfort in his rapport with Detective, confessed to the crime without receiving the benefit of *Miranda* warnings; (6) Detective stopped Uptain midstream and recited the warnings; (7) Uptain continued to reveal the details of the home invasion; and (8) Counsel never sought to suppress the confession that was rendered absent *Miranda* warnings. This is not a silent record characterized by an absence of evidence. Instead, it is a fulsome record replete with facts that objectively establish Counsel's deficient performance.

¶36 The standard for determining deficient performance has long been—and remains—that found in *Strickland*: "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an *objective standard of reasonableness*." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984) (emphasis added). Accordingly, we decline the State's invitation to require positive evidence of Counsel's decision-making process here because we are at a loss to think of (1) anything that Counsel could say about his decision-making process or (2) additional facts that he knew about that would justify his choice not to file a motion to suppress in a situation involving a *Miranda* violation such as this one. Given the facts in the record, we have no trouble concluding that any reasonable attorney would have filed a motion to suppress a confession that was obtained absent the fundamental protection afforded by *Miranda* warnings. In failing to object, Counsel rendered deficient performance, depriving Uptain of the constitutional right against self-incrimination.

¶37 Moreover, our supreme court has said that an ineffective-assistance claim premised on the failure to bring a meritorious motion to suppress will likely be successful. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 53, 428 P.3d 1038 ("It is clear that if his motion to suppress would have been successful had it been

properly argued before the trial court, then [the appellant] would have succeeded on his ineffective assistance of counsel claim."). Here, for the reasons articulated above, *see supra* ¶¶ 26–32, we conclude that a motion to suppress Uptain's confession would have been meritorious. Indeed, we are convinced that there is no apparent reason that the district court would not have granted a motion to suppress given that Uptain was subject to a custodial interrogation but was not initially given his *Miranda* warnings and the statements he made post-*Miranda* were also inadmissible because the late warnings were ineffective to protect Uptain's constitutional rights.

B.     Uptain Was Prejudiced by Counsel's Deficient Performance

¶38     That Uptain was prejudiced by Counsel's failure to suppress the confession is almost self-evident. But for the sake of completeness, we point out the obvious: there was no evidence—apart from his confession—tying Uptain to the crime. Indeed, the State concedes that Uptain's confession was the only evidence of his guilt, stating as follows in its brief: "With no leads, the case remained unsolved. [Vicky's] description was broad enough to describe many possible suspects, including [Uptain]. But police had no other evidence tying anyone to the crime."

¶39     Our appellate courts have repeatedly explained that if a conviction heavily depends on only one piece of evidence that should have been excluded, the inclusion of that evidence is very likely prejudicial. *See State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992) ("[I]f it were the only evidence or one of the only pieces of evidence before the jury, we might well consider it so prejudicial as to undermine our confidence in the verdict."); *State v. Shockley*, 80 P. 865, 873 (Utah 1905) ("[T]he state depended almost entirely upon the confession made by the defendant for conviction. For without this confession it is extremely doubtful if a conviction could have been procured."); *State v. Jones*, 2020 UT App 31, ¶ 35,

462 P.3d 372 ("If the challenged testimony had been the only evidence [on a point], it might have been highly prejudicial."). And we have previously determined that when a conviction rests *entirely* on a piece of evidence that should have been excluded, prejudice is certain. *State v. Gallegos*, 967 P.2d 973, 981 (Utah Ct. App. 1998) ("[T]he only substantive evidence supporting those convictions was the . . . evidence obtained from the unreasonable search. Because [this] evidence . . . was essential to the State's case on those charges, admission of that evidence was obviously prejudicial to [the] defendant . . . . Thus, defense counsel's failure to move for exclusion of the evidence constituted ineffective assistance of counsel.").

¶40 Because Uptain's confession was the only evidence of him having committed the home invasion, we necessarily conclude that Counsel's failure to file a motion to suppress it was prejudicial to Uptain.

CONCLUSION

¶41 Had a motion to suppress Uptain's confession been filed, it would have been meritorious. Counsel was ineffective in failing to file that motion, and Uptain was prejudiced by that failure. Accordingly, we vacate Uptain's convictions and remand this matter for such proceedings as may now be appropriate.

———————